Frank **CAPPUCCITTI** and **Flottec, Inc.,** Appellants,

v.

**GULF INDUSTRIAL PRODUCTS, INC., Appellee.**

No. 01–05–00967–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Feb. 8, 2007.

Stephen M. Ryan, LeBoeuf Lamb, Greene & MacRae, L.L.P., Houston, TX, for Appellants.

Robert L. Ketchand, Constance O'Doherty Barnes, Boyer & Ketchand, A Professional Corporation, Houston, TX, for Appellee.

Panel consists of Justices TAFT, KEYES, and HANKS.

## OPINION

EVELYN V. KEYES, Justice.

Appellants, Frank Cappuccitti and Flottec, Inc., file this interlocutory appeal challenging the trial court's denial of their special appearance motions. Each appellant contends that the trial court erred in denying its motion because the evidence is neither legally nor factually sufficient to support the trial court's finding of specific and general jurisdiction.

We affirm the trial court's denial of Cappuccitti's and Flottec's motions for special appearance.

## FACTS

Appellee Gulf Industrial Products, Inc. ("GIP"), is a Texas corporation with its primary manufacturing facility located in Baytown, Chambers County, Texas ("Bay-

town plant"). It was founded by Robert Kerley, its president, in 1994. GIP manufactures and sells chemicals for use in mining under the tradename "Minerec," a well-recognized name in the mining chemicals business.

In early 2002, appellant Frank Cappuccitti ("Cappuccitti"), a New Jersey resident, telephoned Kerley at the Baytown plant. He explained that he was the general manager of the mining chemicals division of Cytec Industries ("Cytec") and wanted to meet with Kerley. Kerley agreed to a meeting, and Cappuccitti traveled to Texas and met with Kerley at GIP's Baytown plant. During the meeting, Cappuccitti explained that he was unhappy with his current job at Cytec because he was not getting along with the new CEO. Given his experience with Cytec, Cappuccitti told Kerley that he was thinking about quitting his job at Cytec and forming a new company and would like GIP to sell product to him.

Fearful of potential litigation with Cytec, Kerley originally refused Cappuccitti's offer, but reconsidered when Cappuccitti proposed forming a corporation to which GIP could sell its product. A month or two later, Cappuccitti again telephoned Kerley and told him that he had quit Cytec and wanted "to come out and talk ... about buying chemicals from [GIP]." At this meeting, Kerley and Cappuccitti discussed their potential business relationship. Cappuccitti also showed Kerley a contract with Cytec that Cappuccitti had signed which disallowed Cappuccitti from competing with Cytec in the United States. According to Cappuccitti, this contract left him free to conduct business outside the United States. In return for Cappuccitti's promise not to compete with Cytec in the United States, Cytec had agreed to pay Cappuccitti $200,000 over the next year—

money, Cappuccitti explained, he would contribute to his proposed corporation. As a result of these meetings, Kerley agreed to use Cappuccitti's proposed corporation as GIP's sole distributor outside the United States. No agreement or contract was signed at this time, however.

On October 9, 2004, Cappuccitti made another trip to GIP's Baytown plant to discuss using GIP's trademarked name "Minerec" as the name of his new company. Kerley agreed, and Cappuccitti formed Minerec, Inc. ("Minerec"),[1] in the Bahamas on October 22, 2002. On the same day, Cappuccitti also formed CCC Holdings, Inc., Minerec's parent company, in the Bahamas. CCC Holdings, Inc., later changed its name to Flottec, Inc. ("Flottec"). Flottec owns 90% of Minerec. Cappuccitti is Flottec's president and sole shareholder and employee. Cappuccitti is also the president of Minerec and one of only two Minerec employees. The other employee, Randy Nix, owns the remaining 10% of Minerec. Cappuccitti operates both corporations from his home in New Jersey.

Soon after incorporating Minerec and Flottec, Cappuccitti presented a proposed set of agreements to GIP. Over the next few months, Cappuccitti and Kerley negotiated the terms of the agreements between GIP and Minerec. Finally, on January 2, 2003, Kerley, on behalf of GIP, sent a memorandum to Cappuccitti at Minerec:

> Frank, I am sending you here four (signed only by me) Agreement documents for your review, comments, suggestions, etc. and signature if you feel they are ready to be signed. I signed them to give you something that might make you feel comfortable as to whether we really do have a basis for an Agreement on working together. The docu-

1. Minerec does not contest the trial court's exercise of personal jurisdiction over it.

ments are, for the most part, taken directly from your latest drafts to me. Any changes, additions, omissions, etc. are, to a large extent, small, done with the intent to keep fairness to both parties paramount and workable for both of us. Please give me your comments and reactions to them, with special attention to the additions to a couple of sections that I felt were needed in signed agreements.

These are the most extensive, lengthy and detailed documents I have ever signed, without first having them reviewed by an attorney. After we have agreed to the DEAL POINTS we should have them reviewed by DEAL MAKING attorneys.

Attached to the memorandum were (1) a "Sole Distribution Agreement" providing for Minerec to be the sole distributor of GIP products outside of the United States; (2) a "Manufacturing Agreement" providing for GIP to be the exclusive manufacturer of certain products distributed by Minerec; (3) an "Operating Loan Agreement," whereby GIP agreed to provide a $450,000 line of credit to Minerec as working capital; and (4) a general agreement that, among other things, (a) summarized the distribution, manufacturing, and loan agreements, (b) provided for Minerec and GIP to make investments in each other's company, (c) granted Flottec the right to purchase up to 20% of the equity of GIP for a price determined by a formula set out in the Agreement, (d) offered to both Flottec and Minerec a right of "first refusal to purchase at the offered price any and all of the assets or equity of GIP offered for sale to a third party" pursuant to a bona fide sale agreement, and (e) stated the terms by which the Agreement could be terminated and the effects of a termination without cause. The attached agreements also provided, among other things, for Minerec to develop technologies to be manufactured by GIP; GIP to be licensed to use these technologies; and Minerec to be licensed to use brands and trademarks developed by GIP.

According to Cappuccitti, Kerley sent these documents after he had told Kerley that unless he had a signed contract that made financing available he could not go forward. After receiving this memorandum and the attached agreements, which had been signed by Kerley in his capacity as president of GIP, Cappuccitti signed the agreements (collectively, the "Agreement") in his capacity as president of Minerec. According to Cappuccitti, Cappuccitti then called Kerley to let him know that because he now had "something in writing," he could go forward. Cappuccitti could not remember whether he specifically told Kerley that he had also signed the Agreement.

Once Minerec commenced doing business with GIP, Cappuccitti paid himself $10,000 per month as a consultant to Minerec; this continued until November 2003. On at least one occasion, Cappuccitti wrote a personal check to pay a Minerec bill. The check was drawn on an account Cappuccitti held in his individual capacity and had opened for the purpose of providing loans to Minerec. When Cytec learned that Cappuccitti was doing business with GIP, it discontinued its payments to Cappuccitti. Cappuccitti did nothing to contest this.

In April 2004, during the course of a disagreement with Kerley, Cappuccitti referred to the Agreement between GIP and Minerec. Not knowing to which agreement Cappuccitti was referring, Kerley told Cappuccitti he did not have a copy of an agreement. Cappuccitti delivered a signed copy of the Agreement to Kerley.

The business relationship between GIP and Minerec continued until September 24,

2004, when GIP notified Cappuccitti that it was terminating the Agreement "for cause, specifically non-performance." Pursuant to the Agreement, following termination, GIP retained the "Minerec" tradename and Minerec was required to change its name.

Following GIP's termination of the Agreement with Minerec, Cappuccitti paid all of Minerec's obligations, including money Minerec owed to him under a personal line of credit he had extended to Minerec, except that he did not repay the $393,342.32 Minerec owed to GIP under GIP's line of credit to Minerec or the $82,777.31 Minerec owed GIP for product sold by GIP to Minerec. Cappuccitti also transferred ownership of all of Minerec's assets to Flottec, including all cash remaining in GIP's accounts, leaving Minerec insolvent.

## TRIAL COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

The trial court made the following findings of fact:

1. The Court finds that Plaintiff Gulf Industrial Products, Inc. ("GIP") is a Texas Corporation with its principal manufacturing facility located at ... Baytown, Texas in Chambers County Texas.

2. The Court finds that Defendants Frank Cappuccitti ("Cappuccitti") and Flottec, Inc. ("Flottec") did business in Texas. Minerec, Inc. ("Minerec") had contracts and an account with Gulf Industrial Products, Inc., a Texas Resident, for the manufacturing and delivery of goods in Texas. The contract was performable in whole or in part in Texas, Minerec submitted orders, took delivery in Texas of those products that were manufactured in Texas. Minerec also received loans and lines of credit from GIP.

3. This Court finds that Flottec and Cappuccitti are alleged to be liable for the debt of Minerec under doctrines of alter ego, trust fund doctrine and fraudulent conveyance. Cappuccitti was the President of Minerec. Flottec owns 90% of the shares of Minerec. Cappuccitti controlled both entities. Cappuccitti caused Minerec to sell products received from GIP while failing to pay GIP. Cappuccitti nevertheless, paid himself. At a time when Minerec was insolvent, Cappuccitti transferred Minerec's assets to himself and to Flottec. Cappuccitti and Flottec left Minerec with no assets and only the debt owed to GIP. By those actions, Flottec and Cappuccitti are allegedly liable for Minerec's obligations which occurred in Texas to GIP, a business in Chambers County, Texas.

4. The Court finds that the proposed Agreement, Distribution Agreement, Manufacturing Agreement and Operating Loan Agreement (jointly "Agreements") ... are in dispute. The Court finds that the disputed Agreements cover assets and stock of GIP located in Chambers County, Texas.

5. The Court finds that the proposed Agreements were negotiated in Texas.

6. The Court finds that the proposed Agreement provided that Texas law was to be the governing law.

7. The Court finds that under the proposed Agreement, CCC Holdings, n/k/a/ Flottec, Inc. would have the right to purchase stock or assets of GIP in Chambers County, Texas.

8. The Court finds that Cappuccitti signed documents on behalf of GIP relating to transactions in Chambers County, Texas.

9. The Court finds that Cappuccitti attended several executive meetings of GIP at GIP's offices in Texas.... He had access to confidential management

decisions and participated in managing GIP in Chambers County, Texas.

10. The Court finds that Cappuccitti used the laboratory facilities of GIP to conduct metallurgical tests for his separate businesses.

11. The Court finds that Cappuccitti's alleged commission of torts occurred in Texas. Cappuccitti knowingly entered into an alleged fiduciary duty or a special relationship with GIP and Cappuccitti's alleged breaches of those alleged duties to GIP occurred in Texas.

12. The Court finds that Cappuccitti allegedly misrepresented and breached the trust placed with him in the negotiation of proposed Agreements to be held in trust, and executed the documents without complying with the condition of the trust, that the documents be reviewed by a lawyer. This breach of trust related to agreements covering assets and the stock of GIP in Chambers County, Texas.

13. The Court finds that Cappuccitti's alleged acts of common law fraud occurred in Texas. Cappuccitti made representations in Texas, communicated with GIP in person and by telephone to GIP's Baytown, Texas offices. Cappuccitti appeared in Chambers County, Texas in his individual capacity prior to the formation of Flottec or Minerec, and made representations to GIP in Chambers County, Texas.

14. The Court finds that Cappuccitti made representations in Texas which are, in part, the alleged basis of fraud. Cappuccitti failed to accurately describe the terms of his departure from his previous employment, failed to truthfully give projections of transactions he intended to make and intentionally misrepresented his capacities to sell product overseas and made sales to domestic companies, even though this was not contemplated by the parties.

15. The Court finds that Flottec and Cappuccitti's alleged trademark violations and injury to trade name occurred in Texas and against GIP, a Texas corporation. Cappuccitti used the name "Minerec" after the right had been terminated. Subsequently, Cappuccitti caused attempts to log on to the Minerec website to be redirected to Flottec. After Flottec ceased the redirection of Minerec to Flottec, Flottec's website had buried meta tags for searches under the name or Minerec. This infringing activity occurred, in part, in Texas.

16. The Court also finds that Defendant Flottec posted a website for marketing in Texas.

17. The Court finds that Flottec conducted business with other businesses in Texas, including, Sasol, Molex, Advanced Aromatics, Baker Hughes, and Texas Blending. The Court also finds that Cappuccitti traveled to and conducted business in Texas with those businesses located in Texas.

18. The Court finds that adjudicating the dispute in Texas is not a burden on Defendants Cappuccitti and Flottec because Minerec is currently in the lawsuit and Cappuccitti is the President of both.

19. The Court finds that adjudicating the dispute in Texas is not a burden on Defendants Cappuccitti and Flottec because Flottec does business with other businesses located in Texas and Cappuccitti regularly travels to and conducts business in Texas. Minerec has appeared and answered in this lawsuit and Cappuccitti will be involved in that case in Texas.

20. The Court also finds that GIP and Texas have an interest in resolving the dispute in Texas.

478

The Court made the following relevant conclusions of law:

21. Plaintiff GIP pled and proved a prima facie case showing of jurisdiction. Defendants Flottec and Cappuccitti did not negate all bases of personal jurisdiction.

22. This court has personal jurisdiction over Defendants Cappuccitti and Flottec under the Texas long-arm statute and the exercise of jurisdiction is consistent with federal and state due process standards. Defendants Cappuccitti and Flottec had minimum contacts with Texas. Cappuccitti and Flottec purposefully availed themselves of the privilege of conducting activities within Texas, thus, invoking the benefits and protections of Texas laws.

23. In particular, this court has specific jurisdiction over Defendants because Cappuccitti and Flottec did business, including committing torts in Texas, and Defendants' alleged liability arises from or is related to activities conducted within Texas. The activities of Cappuccitti and Flottec are at least minimal and it was foreseeable that Cappuccitti and Flottec, or both, might anticipate being haled into court in Texas.

24. This Court has general jurisdiction over Defendants Cappuccitti and Flottec because they have a substantial connection with Texas that arises from this action and that are [sic] directly related to Defendant(s) activities that were purposefully directed toward Texas, and Defendant(s) have had continuous or systematic contacts with Texas.

25. This court's assertion of personal jurisdiction over Cappuccitti and Flottec will not offend traditional notions of fair play and substantial justice.

26. In declaratory actions, the petition must name as parties all persons or entities that have a claim or interest that would be affected by the declaration. Flottec and Cappuccitti are proper parties affected by the declaration, thus the Declaratory Judgment action applies to Cappuccitti and Flottec.

### STANDARD OF REVIEW

▮▮▮▮ Whether a court has personal jurisdiction over a defendant is a question of law subject to de novo review. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex.2002); *Glattly v. CMS Viron Corp.*, 177 S.W.3d 438, 445 (Tex.App.-Houston [1st Dist.] 2005, no pet.). The trial court, however, must frequently resolve questions of fact before deciding the jurisdiction question. *BMC Software*, 83 S.W.3d at 794. If the trial court enters an order denying a special appearance and issues findings of fact and conclusions of law, we may review the findings of fact on legal and factual sufficiency grounds and review the conclusions of law de novo as a legal question. *Silbaugh v. Ramirez*, 126 S.W.3d 88, 94 (Tex. App.-Houston [1st Dist.] 2002, no pet.) (citing *BMC Software*, 83 S.W.3d at 794). If there is more than a scintilla of evidence to support a factual finding, the legal sufficiency challenge fails. *Shell Compañia Argentina de Petroleo, S.A. v. Reef Exploration, Inc.*, 84 S.W.3d 830, 836 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). A ruling will be reversed for factual insufficiency only if it is so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust. *Id.*

▮▮▮▮ While an appellant may not challenge the trial court's conclusions of law for factual sufficiency, the reviewing court may review the legal conclusions drawn from the facts to determine their correctness. *BMC Software*, 83 S.W.3d at 794. If the reviewing court finds that a conclusion of law is erroneous but that the trial

court rendered the proper judgment, the erroneous conclusion of law does not require reversal. *Id.*

## PERSONAL JURISDICTION

■ The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident[2] defendant within the provisions of the Texas long-arm statute.[3] *Id.* at 793. A nonresident defendant challenging the court's exercise of personal jurisdiction through a special appearance carries the burden of negating all grounds for personal jurisdiction alleged by the plaintiff. *Id.; Glattly,* 177 S.W.3d at 446.

■ Two requirements must be met before a Texas court can exercise personal jurisdiction over a nonresident defendant. First, the Texas long-arm statute must authorize the exercise of jurisdiction, and, second, the exercise of jurisdiction must be consistent with the guarantees of due process. *Tri–State Bldg. Specialties, Inc. v. NCI Bldg. Sys., L.P.,* 184 S.W.3d 242, 248 (Tex.App.-Houston [1st Dist.] 2005, no pet.) (citing *BMC Software,* 83 S.W.3d at 795).

■ The long-arm statute permits Texas courts to exercise personal jurisdiction over a nonresident defendant that "does business" in Texas. Tex. Civ. Prac. & Rem. Code Ann. § 17.042 (Vernon 1997); *BMC Software,* 83 S.W.3d at 795. The statute lists three activities that constitute "doing business": (1) contracting with a Texas resident when either party is to perform the contract in whole or in part in Texas; (2) committing a tort in whole or in part in Texas; and (3) recruiting Texas residents for employment inside or outside of Texas. Tex. Civ. Prac. & Rem.Code Ann. § 17.042. This list, however, is not exclusive,[4] and the statute's "doing business" requirement is limited only by the requirements of federal due process guarantees. *Koll Real Estate Group, Inc. v. Purseley,* 127 S.W.3d 142, 146 (Tex.App.-Houston [1st Dist.] 2003, no pet.) (citing *Schlobohm v. Schapiro,* 784 S.W.2d 355, 356 (Tex.1990)).

■ With respect to personal jurisdiction, federal due process requires two things. First, the nonresident defendant must have purposefully established such minimum contacts with the forum state that the defendant could reasonably anticipate being sued there. *Glattly,* 177 S.W.3d at 446 (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475–76, 105 S.Ct. 2174, 2183–84, 85 L.Ed.2d 528 (1985)). A nonresident establishes minimum contacts with Texas by purposefully availing itself of the privileges and benefits inherent in conducting business in the state. *Koll,* 127 S.W.3d at 146. It is the quality and nature of the defendant's contacts, rather than their number, that is important to the minimum-contacts analysis. *Trigeant Holdings, Ltd. v. Jones,* 183 S.W.3d 717, 725 (Tex.App.-Houston [1st Dist.] 2005, pet. denied). Random, fortuitous, or attenuated acts, or the unilateral acts of a third party, are not sufficient to confer personal jurisdiction. *Id.* Although not determinative, foreseeability is an important consideration in deciding whether a nonresident defendant has purposefully established minimum contacts. *Glattly,* 177 S.W.3d at 446–47.

---

**2.** A "nonresident" includes "an individual who is not a resident of [Texas]" and "a foreign corporation, joint-stock company, association, or partnership." Tex. Civ. Prac. & Rem.Code Ann. § 17.041 (Vernon 1997).

**3.** The Texas long-arm statute governs Texas courts' exercise of jurisdiction over nonresident defendants. *See id.* §§ 17.041–.044 (Vernon 1997), § 17.045 (Vernon Supp.2006).

**4.** *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex.2002).

The minimum contacts element of due process is further divided into general and specific personal jurisdiction. *Id.* at 447. A court may exercise specific jurisdiction over a nonresident defendant if his alleged liability arises from, or is related to, an activity conducted within the forum. *Id.* (citing *CSR, Ltd. v. Link*, 925 S.W.2d 591, 595 (Tex.1996)). The contacts must be purposefully directed at the forum and have a "substantial connection" that results in the alleged injuries. *Shell*, 84 S.W.3d at 837. We focus our analysis on the relationship among the defendant, the forum, and the litigation. *Id.* A court may exercise general jurisdiction over a nonresident defendant if the defendant's contacts with the forum state are continuous and systematic, even if the cause of action did not arise from or relate to the defendant's contacts with the forum. *Glattly*, 177 S.W.3d at 447.

Second, if the nonresident defendant has purposefully established minimum contacts with the forum, the exercise of personal jurisdiction must also comport with traditional notions of fair play and substantial justice. *Id.* (citing *Burger King*, 471 U.S. at 475–76, 105 S.Ct. at 2183–84). As to fairness, the defendant bears the burden of presenting a "compelling case" that exercising jurisdiction over him would not be fair and just. *See id.* at 450. Only in rare cases, however, will a Texas court's exercise of personal jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 231 (Tex.1991).

## ANALYSIS

Appellants argue that the evidence was legally and factually insufficient to support the trial court's findings of general and specific jurisdiction. Appellee responds that the evidence is sufficient to support both general and specific jurisdiction over both Cappuccitti and Flottec because (1) Cappuccitti, Minerec, and Flottec are the alter egos of each other; (2) Cappuccitti, the promoter, owner and president of Flottec, and Minerec, a subsidiary of Flottec, contracted with a Texas resident, GIP, in Texas for the purchase of product from GIP and the right to purchase GIP's assets in Texas, and their Agreement is governed by Texas law; and (3) Minerec, Cappuccitti, and Flottec committed torts in Texas and directed torts towards Texas. Appellants respond that Cappuccitti is a nonresident who acted in Texas only in his capacity as a corporate representative of Minerec and that he is, therefore, protected from the personal jurisdiction of Texas courts by the fiduciary shield doctrine and the corporate veil; appellants further argue that Flottec is a nonresident Bahamian corporation that did not conduct business in Texas.

Minerec did not contest personal jurisdiction. However, both Flottec and Cappuccitti made special appearances "to the entire proceeding," rather than asserting that specific claims were severable and making their special appearances only as to them. *See* Tex.R. Civ. P. 120a(1) ("A special appearance may be made as to an entire proceeding or as to any severable claim involved therein."). Accordingly, if personal jurisdiction exists over Flottec with respect to *any* claim alleged by GIP, we will hold that the trial court properly denied Flottec's special appearance. *See Glattly*, 177 S.W.3d at 447. Similarly, if personal jurisdiction exists over Cappuccitti with respect to *any* claim alleged by GIP, we will hold that the trial court properly denied Cappuccitti's special appearance. *See id.*

As the plaintiff, GIP bore the initial burden of making sufficient allegations to bring Cappuccitti and Flottec within the personal jurisdiction of the trial court. *See BMC Software,* 83 S.W.3d at 793. Once GIP met this burden, Cappuccitti and Flottec were required to negate all possible grounds for personal jurisdiction. *See id.; Glattly,* 177 S.W.3d at 446.

## Minimum Contacts

### Alter Ego

GIP contends that both Cappuccitti and Flottec are subject to personal jurisdiction in the Texas state courts because both are alter egos of each other and of Minerec; therefore, they are not protected from personal jurisdiction by the corporate veil.

Minerec does not contest the trial court's exercise of personal jurisdiction. Moreover, the contacts herein are sufficient to establish that Minerec entered into a contract with GIP in Texas under Texas law that was performable in part in Texas and that Minerec was a party to the allegedly fraudulent transfer of its cash and assets to Flottec. The contacts are also sufficient to establish that Cappuccitti and Flottec both interacted with GIP in Texas through Minerec in connection with both the execution and performance of the Agreement between GIP and Minerec and with the allegedly fraudulent transfer of GIP's assets out of Texas. Thus, if the actions of Minerec that occurred in and were directed towards Texas may be imputed to Cappuccitti and Flottec under the alter ego doctrine, the trial court properly denied the special appearances.

### Corporation and Individual

In general, a corporation is a separate legal entity that shields its owners and shareholders from the jurisdiction of a foreign jurisdiction, even if the corporation itself is within the court's jurisdic-

tion. *See J & J Marine, Inc. v. Le,* 982 S.W.2d 918, 927 (Tex.App.-Corpus Christi 1998, no pet.). A court may, however, under appropriate circumstances, pierce the corporate veil and bring shareholders or others within its jurisdiction as well. *BMC Software,* 83 S.W.3d at 798. One basis for piercing the corporate veil is the alter ego doctrine, which applies when there is such unity between a corporation and an individual that the separateness of the corporation has ceased and asserting jurisdiction over only the corporation would result in an injustice. *Cf. Howell v. Hilton Hotels Corp.,* 84 S.W.3d 708, 714 (Tex.App.-Houston [1st Dist.] 2002, pet. denied) (citing *Castleberry v. Branscum,* 721 S.W.2d 270, 272 (Tex.1986)) (applying standard in context of liability).

This standard also applies to reverse-piercing cases where asserting jurisdiction over only the individual would result in injustice. *Cf. Bolloré S.A. v. Import Warehouse, Inc.,* 448 F.3d 317, 325 (5th Cir.2006) (citing *Zahra Spiritual Trust v. United States,* 910 F.2d 240, 244 (5th Cir.1990) (recognizing, in context of liability, that courts can reverse pierce a corporation's veil based on finding of alter ego)). The end result of both is the same: two separate entities merge into one for jurisdictional purposes. *Cf. Chao v. Occupational Safety and Health Review Comm'n,* 401 F.3d 355, 364 (5th Cir.2005) (stating in context of liability). Thus, to determine whether an alter ego relationship exists in either situation, courts look to the total dealings of the corporation and the individual, including the degree to which corporate and individual property have been kept separately, the amount of financial interest, ownership, and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes. *Bolloré,* 448 F.3d at 325; *Howell,* 84 S.W.3d at 714.

Courts also consider as proof of alter ego the payment of alleged corporate debts with personal checks or other commingling of funds; representations that the individual will financially back the corporation; the diversion of company profits to the individual for personal use; and inadequate capitalization. *Carone v. Retamco Operating, Inc.,* 138 S.W.3d 1, 13 (Tex.App.-San Antonio 2004, pet. denied). An individual's standing as an officer, director, or majority shareholder of an entity alone is not enough to support a finding of alter ego. *Id.*

### Subsidiary Corporation and Parent

The alter ego doctrine has also been applied in the context of a parent corporation and its subsidiary. *See, e.g., BMC Software,* 83 S.W.3d at 799. Texas courts may exercise personal jurisdiction over a nonresident parent corporation if the parent's relationship with its subsidiary that does business in Texas is one that would allow the court to impute the subsidiary's "doing business" to the parent. *Cf. BMC Software,* 83 S.W.3d at 798 (stating same principle in converse terms, *i.e.,* imputing parent's "doing business" to subsidiary). Because Texas law presumes that two separate corporations are distinct entities[5] and that a corporation is an entity separate from its officers and owners,[6] the party seeking to ascribe one corporation's actions to another corporation or individual for jurisdictional purposes by piercing the corporate veil must prove the alter ego relationship. *Id.; Le Meridien Hotels & Resorts v. LaSalle Hotel Operating P'ship, I, L.P.,* 141 S.W.3d 870, 881 (Tex.App.-Dallas 2004, no pet.).

To join the parent company and its subsidiary for jurisdictional purposes, the plaintiff must prove that the parent controls the internal business operations and affairs of the subsidiary. *BMC Software,* 83 S.W.3d at 799. The degree of control exercised by the parent must be greater than that normally associated with common ownership and directorship. *Id.* Thus, the plaintiff must present evidence showing that the two entities are not separate and the corporate veil, therefore, should be pierced to prevent fraud or injustice. *Id.*

### Interrelatedness of Cappuccitti, Minerec, and Flottec

GIP presented sufficient evidence at the special appearance hearing to prove that a relationship among Cappuccitti, Minerec, and Flottec existed such that piercing the corporate veil and bringing Cappuccitti and Flottec within the personal jurisdiction of the trial court is justified. *See BMC Software,* 83 S.W.3d at 798–99; *Le Meridien Hotels,* 141 S.W.3d at 881.

Cappuccitti incorporated Flottec, the holding company, and Minerec, its subsidiary, as Bahamian corporations on the same day. He did this in anticipation of the Agreement with GIP whereby GIP would loan Minerec working capital. Although Cappuccitti owned no shares of Minerec directly, he did own 100% of the shares of Flottec which, in turn, owned 90% of the shares of Minerec. Cappuccitti also served as the president of Flottec; Flottec had no other employees. Cappuccitti was also the president of Minerec and one of only two Minerec employees. Cappuccitti operated both Minerec and Flottec from his home in New Jersey.

---

**5.** *BMC Software,* 83 S.W.3d at 798 (citing *Bell Oil & Gas Co. v. Allied Chem. Corp.,* 431 S.W.2d 336, 339 (Tex.1968)).

**6.** *Tri–State Bldg. Specialties, Inc. v. NCI Bldg. Sys., L.P.,* 184 S.W.3d 242, 250 (Tex.App.-Houston [1st Dist.] 2005, no pet.).

Cappuccitti signed the Agreement in his capacity as the president of Minerec. The Agreement provided, among other things, (1) for GIP to be the exclusive manufacturer of certain products distributed by Minerec; (2) for Minerec to develop technologies to be manufactured by GIP; (3) for GIP to be licensed to use these technologies; (4) for Minerec to be licensed to use brands and trademarks developed by GIP; (5) for Minerec and GIP to make investments in each other's company; and (6) for GIP to extend a $450,000 line of credit to Minerec.[7] The Agreement also granted Flottec the right to purchase up to 20% of the equity of GIP for a price determined by a formula set out in the Agreement, and it offered to both Flottec and Minerec a right of "first refusal to purchase at the offered price any and all of the assets or equity of GIP offered for sale to a third party" pursuant to a bona fide sale agreement. The Agreement, therefore, was performable in part in Texas by Minerec in its capacity as a subsidiary of Flottec, and it granted Flottec rights to purchase the equity and assets of GIP in Texas. See TEX. CIV. PRAC. & REM.CODE ANN. § 17.042(2).

From the time Minerec was incorporated and began doing business with GIP until November 2003, Minerec paid Cappuccitti $10,000 per month as a consultant. Moreover, on at least one occasion, Cappuccitti wrote a personal check to pay a bill of Minerec, rather than Minerec itself paying the bill from a corporate account. The check was drawn on an account that Cappuccitti held in his individual capacity and had opened for the purpose of providing loans to Minerec. This checking account served as one of Minerec's two lines of credit, the other being from GIP. Before the incorporation of Minerec and Flottec, Cappuccitti explained to Kerley that the $200,000 that Cytec would pay him over the course of one year was additional money that would be used to capitalize his contemplated corporation. Cappuccitti failed to find replacement funding for Minerec, however, when Cytec refused to pay Cappuccitti. Therefore, Minerec's only sources of funding were Cappuccitti and GIP.

When GIP terminated the agreement between itself and Minerec, Cappuccitti paid all of Minerec's obligations, including money owed to himself pursuant to Minerec's line of credit with him, *except* the $393,342.32 due to GIP under its line of credit to Minerec and the $82,777.31 due to GIP for product it sold to Minerec. In his position as president of both Minerec and Flottec, Cappuccitti also transferred ownership of Minerec's assets to Flottec, including all cash remaining in Minerec's accounts, leaving Minerec insolvent and unable to pay its debt to GIP. Moreover, the transfer of Minerec's office equipment from Minerec to Flottec was, in effect, a

---

**7.** Attached to the memorandum as exhibits and incorporated therein were (1) a "Sole Distribution Agreement" providing for Minerec to be the sole distributor of GIP products outside of the United States; (2) a "Manufacturing Agreement" providing for GIP to be the exclusive manufacturer for certain products distributed by Minerec; (3) an "Operating Loan," whereby GIP agreed to provide a $450,000 line of credit to Minerec as working capital; and (4) a general agreement that, among other things, (a) summarized the distribution, manufacturing, and loan agreements, (b) provided for Minerec and GIP to make investments in each other's company, (c) granted Flottec the right to purchase up to 20% of the equity of GIP for a price determined by a formula set out in the Agreement, (d) offered to both Flottec and Minerec a right of "first refusal to purchase at the offered price any and all of the assets or equity of GIP offered for sale to a third party" pursuant to a bona fide sale agreement, and (e) stated the terms by which the Agreement could be terminated and the effects of a termination without cause.

sale of assets from which any revenue generated was owed to GIP; Cappuccitti, however, allegedly transferred the assets from Minerec to Flottec for no value.[8] The record shows no source of funding for Flottec other than the funds Cappuccitti transferred from Minerec to Flottec and a $250,000 personal line of credit Cappuccitti secured in September 2004 and loaned to Flottec for use in the business.[9]

After considering the evidence, we hold that GIP presented sufficient evidence that Cappuccitti, Flottec, and Minerec were alter egos of each other such that exercising personal jurisdiction over Cappuccitti and Flottec is justified in that (1) as president of both Minerec and Flottec and the sole owner of Flottec, which owned 90% of Minerec, Cappuccitti exercised complete control over the activities of both Minerec and Flottec; (2) on at least one occasion, Cappuccitti paid a debt of Minerec with a personal check; (3) Cappuccitti backed Minerec with a personal line of credit but failed to find replacement funding for Minerec when Cytec refused to pay Cappuccitti; (4) the Agreement between GIP and Minerec gave Flottec the right to purchase equity in GIP and gave *both* Minerec and Flottec a right of first refusal to purchase GIP's assets in Texas; and (5) Cappuccitti, Minerec, and Flottec allegedly were used interchangeably to transfer assets from one to the other,[10] which rendered Minerec insolvent and unable to repay GIP for product GIP sold to Minerec or to repay GIP for money loaned to Minerec under GIP's line of credit.

We conclude, therefore, that GIP met its burden of proving a relationship among Cappuccitti, Minerec, and Flottec such that piercing the corporate veil and bringing Cappuccitti and Flottec within the personal jurisdiction of the trial court is justified. *See BMC Software*, 83 S.W.3d at 798–99; *Le Meridien Hotels*, 141 S.W.3d at 881; *see also Bolloré*, 448 F.3d at 325; *Carone*, 138 S.W.3d at 13; *Howell*, 84 S.W.3d at 714.

### Fiduciary Shield Doctrine

Appellants contend, however, that acts performed by Cappuccitti and for which he

8. The record contains evidence to support these allegations. Among other things, Cappuccitti admitted at his deposition that he had transferred "under $10,000 worth of ... office equipment" from Minerec to Flottec; at the special appearance, however, he claimed that the value of the transferred office equipment was about $1,000. Cappuccitti also admitted at his deposition that he had closed Minerec's bank account and that "there may have been a very small quantity of money in there ... transferred over ... like 2– or $300." Cappuccitti then retracted this statement, claiming that "the accountants cleaned everything up" and he was not "sure exactly what they did with ... dollars that might have been left over." At the special appearance, however, Cappuccitti denied that any cash had been transferred from Minerec to Flottec.

9. At deposition, Cappuccitti admitted that, in September 2004, he secured a personal line of credit from Merrill Lynch for $250,000 se-

cured by his house. He described this as "money loaned to Flottec" and "used in the business."

10. GIP has alleged fraudulent transfer claims against Flottec and Cappuccitti under the Texas Uniform Fraudulent Transfers Act (UFTA). *See* TEX. BUS. & COM.CODE ANN. §§ 24.001–.012 (Vernon 2002), § 24.013 (Vernon Supp.2006). Under the UFTA, a fraudulent transfer is one made "with actual intent to hinder, delay, or defraud any creditor of the debtor." *Id.* § 24.005(a)(1). The UFTA creates liability not only against "the person for whose benefit the transfer was made," such as the debtor, but also against "the first transferee of the asset," or any "subsequent transferee." *Id.* § 24.009(b); *Trigeant*, 183 S.W.3d at 726. GIP alleged in its petition that Cappuccitti fraudulently transferred Minerec's assets to Flottec "with the intent to hinder, delay or defraud [GIP] by placing [Minerec]'s property beyond GIP's reach." *See* TEX. BUS. & COM.CODE ANN. § 24.005.

has been sued are all acts in his corporate capacity for which he is protected against jurisdiction by the fiduciary shield. We disagree.

*Cappuccitti's Actions After the Incorporation of Minerec and Flottec*

■ Appellant cites several cases for the proposition that jurisdiction over an individual may not be predicated on jurisdiction over a corporation unless the corporation is the alter ego of the individual. *See J & J Marine,* 982 S.W.2d at 927; *Garner v. Furmanite Australia Pty., Ltd.,* 966 S.W.2d 798, 803 (Tex.App.-Houston [1st Dist.] 1998, pet. denied) (citing *Stuart v. Spademan,* 772 F.2d 1185, 1197 (5th Cir.1985)); *MacMorran v. Wood,* 960 S.W.2d 891, 898 (Tex.App.-El Paso 1997, pet. denied), *overruled on other grounds by Tuscano v. Osterberg,* 82 S.W.3d 457 (Tex.App.-El Paso 2002, no pet.); *Al-Turki v. Taher,* 958 S.W.2d 258, 263 (Tex. App.-Eastland 1997, pet denied); *Vosko v. Chase Manhattan Bank, N.A.,* 909 S.W.2d 95, 99 (Tex.App.-Houston [14th Dist.] 1995, writ denied); *Clark v. Noyes,* 871 S.W.2d 508, 518 (Tex.App.-Dallas 1994, no writ) (citing *Spademan,* 772 F.2d at 1197). Cappuccitti also cites *Siskind v. Villa Foundation for Education, Inc.,* for the proposition that a nonresident employee of a foreign corporation cannot be sued in Texas based on his employer's solicitation of business in Texas because due process considerations forbid such "bootstrapping" of minimum contacts. 642 S.W.2d 434, 437–38 (Tex.1982).

Because we have already held that Minerec is an alter ego of Cappuccitti, the corporate form of Minerec does not shield Cappuccitti from suit in Texas in connection with the activities of Minerec.

*Cappuccitti's Actions as Promoter of Minerec*

■ Nor is Cappuccitti protected by the fiduciary shield with respect to his activities prior to the incorporation of Minerec. The record shows that Cappuccitti visited Texas on several occasions before Minerec and Flottec were incorporated on October 22, 2002, and Cappuccitti admits that he was acting in his capacity "as promoter of and on behalf of [the] company that became Minerec, Inc." In all of the cases cited by Cappuccitti, the individual over whom personal jurisdiction was sought was an *officer, employee,* or *shareholder* of an *existing* corporation. Cappuccitti cites no authority holding that the fiduciary shield doctrine also applies to a *promoter* of a *nonexistent* corporation. He argues, rather, that because a promoter is generally viewed as a trustee of his corporation and, therefore, owes a fiduciary duty to the corporation just as if the principal-agent relationship actually existed, a promoter should be extended the same protection under the fiduciary shield doctrine as the corporate officer who also owes a fiduciary duty to the corporation. *See* 15 Tex. Jur. 3d Corporations § 25 (2004).

■ The fiduciary shield doctrine reflects a judicial interpretation of the phrase "transacting business." *Chase v. Pan–Pacific Broad., Inc.,* 617 F.Supp. 1414, 1423 (D.D.C.1985) (citing *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 902 n. 2 (2d Cir.1981) ("The fiduciary shield doctrine is not a constitutional principle, but is rather a doctrine based on judicial inference as to the intended scope of the longarm statute.")). In other words, courts applying the doctrine hold that "it is the corporation—not the individual who acts for the corporation—which is 'transacting business' under the relevant longarm statute." *Chase,* 617 F.Supp. at 1423. This interpretation rests on agency theory: the individual employee or officer who acts for the corporation is that corporation's agent. *See Holloway v. Skinner,* 898

S.W.2d 793, 795 (Tex.1995) ("[T]he actions of a corporate agent on behalf of the corporation are deemed the corporation's acts."). Thus, a corporate officer's status as an agent of the corporation for which he acts—not his fiduciary duty to the corporation—is the basis for application of the fiduciary shield doctrine to him. Appellant's argument, therefore, that the fiduciary shield doctrine should apply to a promoter based on his fiduciary duty to the future corporation for which he acts is without merit. A promoter cannot act as an agent of a corporation that does not yet exist; therefore, the corporation cannot be transacting business through the promoter, and the fiduciary shield doctrine cannot apply to him. *See Chase,* 617 F.Supp. at 1423; *see also Fish v. Tandy Corp.,* 948 S.W.2d 886, 897 (Tex.App.-Fort Worth 1997, pet. denied) ("A nonexistent corporation can have no agent."). Accordingly, we hold that the fiduciary shield doctrine does not protect Cappuccitti with respect to his actions prior to the incorporation of Minerec.

■ We find that Cappuccitti's actions prior to the incorporation of Minerec and Flottec either occurred in Texas or were purposefully directed at Texas. *See Glattly,* 177 S.W.3d at 446–47; *Shell,* 84 S.W.3d at 837. None were random, fortuitous, or attenuated. *See Trigeant,* 183 S.W.3d at 725. Thus, Cappuccitti, in his individual capacity as promoter of Minerec, purposefully availed himself of the privileges and benefits of conducting business in Texas. *See Koll,* 127 S.W.3d at 146. Therefore, Cappuccitti's actions as promoter of Minerec constitute "doing business" in Texas, and subject him to the specific jurisdiction of the Texas courts in his personal capacity for all claims and causes of action arising out of or in connection with his promotion activities. *See* Tex. Civ. Prac. & Rem.Code

Ann. § 17.042; *Glattly,* 177 S.W.3d at 446–47.

### Fair Play and Substantial Justice

■ Having found that Cappuccitti and Flottec purposefully established minimum contacts with Texas, we must consider whether the exercise of personal jurisdiction over them comports with traditional notions of fair play and substantial justice. *See Glattly,* 177 S.W.3d at 447 (citing *Burger King,* 471 U.S. at 475–76, 105 S.Ct. at 2183–84). In making this inquiry, we consider, when appropriate, (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental, substantive social policies. *Guardian Royal,* 815 S.W.2d at 231.

■ First, there is no undue burden on either Cappuccitti or Flottec in defending this case in Texas. Minerec, Flottec, and Cappuccitti are all alter egos of each other. Cappuccitti is president of Minerec, and Minerec did not contest the personal jurisdiction of the trial court over it. Moreover, Cappuccitti visited Texas on several occasions to do business in this State in connection with the transactions that are the subject of this suit. Flottec is the parent of Minerec and a beneficiary of the Agreement between GIP and Minerec, which gave Flottec the right to purchase equity in GIP and GIP's assets in Texas. Flottec is also the alleged recipient of Minerec's tangible assets and funds loaned by GIP to Minerec and allegedly fraudulently transferred by Cappuccitti from Minerec to Flottec, leaving Minerec insolvent. Therefore, transactions involving Cappuccitti and Flottec will necessarily be at issue

in the claims being tried in Texas and will not require great additional burdens to try.

Second, Texas has an interest in resolving this dispute because it involves (a) the solicitation and conduct of business in Texas, including the execution of agreements performable in part in Texas under Texas law by Cappuccitti in his personal capacity and as the alter ego of both Minerec and Flottec to the benefit of all defendants and (b) the alleged fraudulent transfer of the funds of a Texas corporation out of the country. Texas has a substantial interest in protecting its citizens both against harm from breach of contract and against harm from the torts alleged in this litigation. *See Silbaugh,* 126 S.W.3d at 96 (finding that exercise of jurisdiction comported with fair play and substantial justice because Texas has an interest in ensuring that its citizens are protected from breach of contract and tortious acts committed by nonresidents conducting business in Texas). Third, GIP, as a Texas corporation with its principal place of business in Texas, can obtain the most convenient and efficient relief in Texas. Fourth, the efficient resolution of this controversy is promoted by adjudication in Texas because Minerec has not contested the trial court's assertion of personal jurisdiction, and, therefore, GIP's suit against Minerec will go forward in Texas. Trying GIP's suit against Cappuccitti and Flottec, alter egos of Minerec, in Texas, rather than in New Jersey, will avoid duplication of efforts and minimize the possibility of inconsistent findings on common issues. *See J.D. Fields & Co., Inc. v. W.H. Streit, Inc.,* 21 S.W.3d 599, 605 (Tex.App.-Houston [1st Dist.] 2000, no pet.) (finding the efficient resolution of controversy promoted by adjudication in Texas because suit against defendant company's surety was still pending in Texas and reconsolidating the suit against defendants with the suit against

the surety avoided duplication of efforts and minimized the possibility of inconsistent findings on common issues).

Lastly, the interests of the two states involved, New Jersey and Texas, are best served by trying the interrelated claims against all defendants in Texas where the alleged financial scheme was promoted and partially executed and where the alleged damages occurred. Accordingly, we hold that the trial court's exercise of jurisdiction over all defendants does not offend traditional notions of fair play and substantial justice. *See Glattly,* 177 S.W.3d at 447 (citing *Burger King,* 471 U.S. at 475–76, 105 S.Ct. at 2183–84). The trial court's exercise of personal jurisdiction over Cappuccitti and Flottec is supported by the evidence and is, therefore, proper.

We overrule Cappuccitti's and Minerec's sole points of error.

### CONCLUSION

We affirm the trial court's denial of Cappuccitti's and Flottec's motions for special appearance.