Opinion issued January 19, 2012



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-11-00383-CV

———————————

Mikuni Corporation, Appellant

V.

Todd Foster,
Candy Foster, and Classic Honda Mini Trails, Appellees



 



 

On Appeal from the 215th District Court

Harris County, Texas



Trial Court Case No. 2009-05755

 



 

MEMORANDUM OPINION

          This is a products
liability lawsuit arising from a motorcycle accident.  Appellees Todd and Candy Foster sued Classic
Honda Mini Trails (“CHT”) for distributing an allegedly defective carburetor
that was installed on the bike.  CHT
filed third-party claims against several parties including appellant Mikuni
Corporation (“Mikuni”).  Mikuni brings this
interlocutory appeal from the trial court’s denial of its special
appearance.  See Tex. Civ. Prac &
Rem. Code Ann. § 51.014(a)(7) (West 2008).  Because Mikuni has negated all of the alleged
bases for personal jurisdiction, we vacate the order denying Mikuni’s special
appearance and render judgment dismissing Mikuni from the case.

Background

          Todd Foster was severely injured while
riding his Kawasaki KLX110 motorcycle on private property in Harris
County.  The Fosters allege that the
motorcycle’s throttle became stuck, causing Todd to fall backwards and suffer
injuries to his spinal cord.  The
previous owner of the motorcycle had a kit installed which enhanced the
motorcycle’s performance.  Attributing
the accident to the defective design and assembly of the throttle and alleging
negligence and strict liability, Foster and his wife sued the motorcycle
manufacturer and CHT, which packaged the component parts of the performance kit.  CHT in turn sued Mikuni, which is a Japanese company
that manufactured the carburetor included with the kit, and Mikuni’s California-based
subsidiary, Mikuni American Corporation (“MAC”).

          Mikuni specially appeared and challenged
the court’s exercise of personal jurisdiction over it.  Mikuni supported its special appearance with
an employee’s affidavit swearing, among other things, that Mikuni had never
done business in Texas.  MAC does not
dispute that it is subject to the jurisdiction of the trial court, and it is
not a party to this interlocutory appeal.

The Fosters and CHT conducted jurisdictional discovery.  CHT’s president testified in a deposition
that he had purchased the Mikuni carburetor on Foster’s motorcycle from a
Japanese distributor, Kitaco.  Mikuni was
not a party to that transaction.  CHT
initiated the transaction with Kitaco in Japan by sending a purchase order,
wiring money, and then accepting delivery of the product in Japan through an
agent.

MAC’s president stated in an affidavit that, based on the part number and
production code, MAC did not manufacture, design, market, or sell the
carburetor installed on Foster’s motorcycle. 
MAC’s president also testified in a deposition that he considered the
Mikuni chairman to be his supervisor and that there was a “mutual
understanding” that MAC handles the marketing of Mikuni products for the
“American continent.”

The Fosters opposed Mikuni’s special appearance motion, arguing that
Mikuni directed business to Texas through MAC as its alter ego, and therefore Mikuni
was subject to the court’s jurisdiction. 
CHT made similar alter-ego arguments, and it additionally argued that
Mikuni’s affidavit supporting the special appearance motion was improperly
verified.

The trial court denied Mikuni’s special appearance without making
specific findings of fact or conclusions of law.  Mikuni timely filed this interlocutory appeal.

Analysis

I.                 
Verification of affidavit

As a threshold issue,
CHT argues that we should not consider the affidavit supporting Mikuni’s
special appearance because it does not expressly state that the facts set forth
therein are true.  Mikuni argues that this
cross-issue is being argued for the first time on appeal, and therefore it has
been waived.

          The
Rules of Civil Procedure provide that a “special appearance shall be made by
sworn motion” and that “[e]very appearance, prior to judgment, not in compliance
with this rule is a general appearance.” 
Tex. R. Civ. P.
120a(1).  A general prerequisite to
presenting an issue for appellate review is that the complaining party made a
motion to the trial court in which it stated the grounds for complaint, and
that the trial court made an adverse ruling. 
Tex. R. App. P. 33.1(a).  Had this objection to form been made in the
trial court, Mikuni may have been able to cure the defect by amending its
special appearance and supporting affidavit. 
See Tex. R. Civ. P. 120a(1) (allowing a special appearance
to “be amended to cure defects”); Dawson-Austin
v. Austin, 968 S.W.2d 319, 322 (Tex. 1998) (interpreting Rule 120a(1) to
“not limit the kinds of defects that can be cured”).

The record does not
show that CHT objected to the form of Mikuni’s affidavit in the trial court,
depriving Mikuni of the opportunity to cure the defect.  Thus, this argument has not been preserved
for our review, and Mikuni’s affidavit supporting its special appearance can be
included in our review of the special appearance issue.

II.              
Personal jurisdiction over Mikuni

When, as in this case, the trial court does not make findings of fact and
conclusions of law in support of its denial of a special appearance, “all facts
necessary to support the judgment and supported by the evidence are
implied.”  BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d 789, 795 (Tex.
2002).  As a court of appeals, we may
review the trial court’s implied findings for both legal and factual
sufficiency.  Id. at 794.  However, whether
those implied findings of fact establish personal jurisdiction is a question of
law which we review de novo.  Id.

“[T]he plaintiff and the defendant bear shifting burdens of proof in a
challenge to personal jurisdiction.”  Kelly v. Gen. Interior Const., Inc., 301
S.W.3d 653, 658 (Tex. 2010).  “The
plaintiff bears the initial burden of pleading allegations sufficient to bring
a nonresident defendant within the provisions of the long-arm statute,” thus conferring
jurisdiction.  Am. Type Culture Collection, Inc. v. Coleman, 83 S.W.3d 801, 807
(Tex. 2002); see also Tex Civ. Prac & Rem Code Ann.
§ 17.042 (West 2008) (long-arm statute). 
“But upon filing a special appearance, the nonresident defendant assumes
the burden to negate all the bases of personal jurisdiction alleged by the
plaintiff.”  Am. Type Culture Collection, 83 S.W.3d at 807 (citing Kawasaki Steel Corp. v. Middleton, 699
S.W.2d 199, 203 (Tex. 1985)).  “Because
the plaintiff defines the scope and nature of the lawsuit, the defendant’s
corresponding burden to negate jurisdiction is tied to the allegations in the
plaintiff’s pleading.”  Kelly, 301 S.W.3d at 658.  The defendant can then negate jurisdiction on
either a factual or legal basis.  See id. at 659.

CHT and the Fosters allege that Mikuni “does business” in Texas, which is
sufficient to meet their initial burden to assert personal jurisdiction over
Mikuni.  See Tex. Civ. Prac. &
Rem. Code Ann. § 17.042; Am.
Type Culture Collection, 83 S.W.3d at 807. 
Thus, we examine whether Mikuni has met its burden of negating this
basis for personal jurisdiction.

“Texas courts may assert in personam
jurisdiction over a nonresident if (1) the Texas long-arm statute
authorizes the exercise of jurisdiction, and (2) the exercise of
jurisdiction is consistent with federal and state due-process guarantees.”  Moki
Mak River Expeditions v. Drugg, 221 S.W.3d 569, 574 (Tex. 2007).  The Texas long-arm statute provides that a
nonresident who “does business” in the state is subject to personal
jurisdiction.  Tex. Civ. Prac. & Rem. Code Ann. § 17.042.  “[T]he long-arm statute’s broad doing-business
language allows the statute to ‘reach as far as the federal constitutional
requirements of due process will allow.’” 
Moki Mak, 221 S.W.3d at 574
(quoting Guardian Royal Exch. Assurance,
Ltd. v. English China Clays, P.L.C., 815 S.W.2d 223, 226 (Tex. 1991)).  Thus, when “doing business” is the alleged
ground for personal jurisdiction, “we only analyze whether [the nonresident
defendant’s] acts would bring [it] within Texas’ jurisdiction consistent with
constitutional due process requirements.” 
Retamco Operating, Inc. v.
Republic Drilling Co., 278 S.W.3d 333, 337 (Tex. 2009).  

Personal jurisdiction is proper when the nonresident defendant has
established “minimum contacts” with the forum state, and the exercise of
jurisdiction comports with “traditional notions of fair play and substantial
justice.”  Int’l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 158
(1945).  Minimum contacts are sufficient
for personal jurisdiction when the nonresident defendant “purposefully avails
itself of the privilege of conducting activities within the forum State, thus
invoking the benefits and protections of its laws.”  Hanson
v. Denckla, 357 U.S. 235, 253, 78 S. Ct. 1228, 1240 (1958).  The Supreme Court of Texas has identified
three aspects embedded in the concept of purposeful availment.  See Michiana
Easy Livin’ Country, Inc. v. Holten, 168 S.W.3d 777, 785 (Tex. 2005).  First, it is only the defendant’s contacts
with the forum that count, rather than the unilateral activity of another party
or a third person.  Id.  Second, the acts relied upon
must be purposeful rather than random, isolated, or fortuitous.  Id.  Third, a defendant must seek some benefit,
advantage, or profit by availing itself of the jurisdiction.  Id.

A nonresident defendant’s purposeful availment of the forum state may
give rise to one of two types of personal jurisdiction: specific or
general.  See Helicopteros Nacionales de Colom., S.A. v. Hall, 466 U.S. 408, 414–15,
104 S. Ct. 1868, 1872 (1984).  Specific
jurisdiction is established when two conditions are met: (1) the
nonresident defendant has “made minimum contacts with Texas by purposefully
availing itself of the privilege of conducting activities here,” and (2) the
nonresident defendant’s alleged liability arose “from or related to those
contacts.”  Moki Mak, 221 S.W.3d at 576.  The second “relatedness” requirement means
that “for a nonresident defendant’s forum contacts to support an exercise of
specific jurisdiction, there must be a substantial connection between those
contacts and the operative facts of the litigation.”  Id.
at 585.  

In contrast to specific jurisdiction, general jurisdiction arises “where
the defendant’s activities in the forum are continuing and systematic,” in
which case jurisdiction may be properly exercised “without a relationship
between defendant’s particular act and the cause of action.”  Schlobohm
v. Schapiro, 784 S.W.2d 355, 357 (Tex. 1990) (citing Helicopteros, 466 U.S. at 414 n.9, 104 S. Ct. at 1872 n.9).  “The minimum contacts inquiry is broader and
more demanding when general jurisdiction is alleged, requiring a showing of
substantial activities in the forum state.” 
Id.  For a corporation, the “paradigm forum” for
the exercise of general jurisdiction is “one in which the corporation is fairly
regarded as at home.”  Goodyear Dunlop Tires Operations, S.A. v.
Brown, 131 S. Ct. 2846, 2853–54 (2011).

A.   Jurisdictional
alter ego

Before we examine whether Mikuni’s contacts give rise to either general
or specific personal jurisdiction, we first address an argument raised by CHT
and the Fosters bearing upon what forum contacts are imputable to Mikuni.  Given the arguments and proof presented in
connection with the special appearance, the trial court may have concluded that
Mikuni and MAC were jurisdictional alter egos.  If the trial court made such a conclusion, it
would have imputed MAC’s contacts to Mikuni, and Mikuni’s special appearance may
have been denied on that basis.  We review
the trial court’s implied findings for legal and factual sufficiency.  See BMC
Software, 83 S.W.3d at 795.

CHT argues that Mikuni and MAC can be fused together as “alter egos” for
jurisdictional purposes because Mikuni exercises control over MAC’s internal
business operations.  The Fosters similarly
argue that Mikuni manifested an intent to serve the Texas market because its
subsidiary, MAC, does business in Texas and Mikuni has direct control over
MAC.  Mikuni contends that the Fosters
and CHT presented no evidence showing that Mikuni exercises the necessary level
of control over MAC to disregard their corporate separateness for
jurisdictional purposes.

          A parent company and its subsidiary
may be “fused” for jurisdictional purposes if the plaintiff proves that “the
parent controls the internal business operations and affairs of the
subsidiary.”  Id. at 799.  “But the degree
of control the parent exercises must be greater than that normally associated
with common ownership and directorship; the evidence must show that the two
entities cease to be separate so that the corporate fiction should be
disregarded to prevent fraud or injustice.” 
Id. (citing Hargrave v. Fibreboard Corp., 710 F.2d
1154, 1159 (5th Cir. 1983)).  A parent
company cannot be subjected to personal jurisdiction based on the local activities
of its subsidiary when “the subsidiary’s presence in the state is primarily for
the purpose of carrying on its own business and the subsidiary has preserved
some semblance of independence from the parent and is not acting as merely one
of its departments . . . .” 
4A Charles Alan Wright &
Arthur R. Miller, Federal Practice and Procedure § 1069.4 (3d ed.
2002).  “[T]he party seeking to ascribe
one corporation’s actions to another by disregarding their distinct corporate
entities [must] prove this allegation, because Texas law presumes that two
separate corporations are distinct entities.” 
PHC-Minden, L.P. v. Kimberly-Clark
Corp., 235 S.W.3d 163, 173 (Tex. 2007). 
“[V]eil-piercing for purposes of liability (‘substantive veil-piercing’)
is distinct from imputing one entity’s contacts to another for jurisdictional
purposes (‘jurisdictional veil-piercing’).” 
Id. at 174.

Our Supreme Court has identified four relevant factors in the
jurisdictional veil-piercing analysis: (1) the amount of the subsidiary’s stock
owned by the parent corporation; (2) the existence of separate
headquarters; (3) the observance of corporate formalities; and (4) the
degree of the parent’s control over the general policy and administration of
the subsidiary.  Id. at 175 (citing 4A Wright
& Miller, supra, § 1069.4).  Parent companies normally exercise at least
some control over their subsidiaries, and “[a] subsidiary corporation will not
be regarded as the alter ego of its parent merely because of stock ownership, a
duplication of some or all of the directors or officers, or an exercise of the
control that stock ownership gives to stockholders.”  Gentry
v. Credit Plan Corp. of Houston, 528 S.W.2d 571, 573 (Tex. 1975).  Thus, the factors favoring alter-ego status
must be applied to the facts to determine whether a parent exercises the sort
of control over the subsidiary that is required to fuse them for jurisdictional
purposes.  See PHC-Minden, 235 S.W.3d at 176 (weighing multiple indicia of
corporate separateness).

The Fosters and CHT have pointed to several facts in the record to
establish Mikuni’s control over MAC. 
First, Mikuni is the majority shareholder of MAC, and MAC’s profits and
losses are reflected on Mikuni’s balance sheet.  MAC’s president takes direction from Mikuni’s
chairman—who is, incidentally, the father of MAC’s president—and considers him
a “supervisor.”  Mikuni could “assign” business
development assignments to MAC.  Except
for the president and the chief financial officer of MAC, all other directors
on MAC’s board are Mikuni employees.  The
only formal agreement existing between the companies is a “technical service
agreement,” which licenses MAC to manufacture Mikuni-designed products in
exchange for compensation.  MAC provides
Mikuni with market research upon request, and MAC performs at least some
services free of charge.  MAC’s president
also stated that there is a “mutual understanding” that MAC is responsible for
Mikuni’s sales on the “American continent” and that Mikuni would not compete
with MAC.  Mikuni’s website calls MAC its
“American arm.”

The facts above tend to show that Mikuni exercises some degree of control
over MAC; however, the question remains whether Mikuni exercises control over
MAC’s internal business operations in a way that is inconsistent with investor
status.  PHC-Minden v. Kimberly-Clark Corp., 235 S.W.3d 163 (Tex. 2007), is
especially instructive to answering this question.  In that case, the Supreme Court considered
whether the Texas-related contacts of a parent company should be imputed to its
non-resident subsidiary.  PHC-Minden, 235 S.W.3d at 172. 
While a patient in a Louisiana hospital, a woman acquired toxic shock
syndrome and died from the infection.  Id. at 165.  The woman’s next friend and estate
representative sued in Texas the manufacturer of her tampons, which in turn
sued the hospital, alleging that the hospital’s parent company, though based in
Tennessee, had contacts with Texas that were imputable to the hospital in
Louisiana.  Id. at 165–66.

The Supreme Court relied on the following facts to conclude that the
Texas-related contacts of the Tennessee parent were not imputable to the Louisiana
hospital:

The
two entities maintain separate headquarters, Minden [the subsidiary hospital]
in Louisiana and Province [the parent company] in Tennessee.  Minden’s Board of Governors approves Minden’s
budget and oversees day-to-day operations, and Minden alone establishes its
policies and procedures for providing health care to patients.  Province is not involved in Minden’s
physician recruitment, and the two entities share no directors.  While Minden’s chief executive officer, chief
nursing officer, and chief financial officer receive their paychecks from
Province, their salaries are intercompany payables; that is, the monies come
from Minden’s revenues.  Similarly, while
Province provides Minden’s general liability insurance and a group health
insurance policy for its employees, the policies are funded from Minden’s
revenues.  There is no indication that
Minden and Province have disregarded corporate formalities.  The court of appeals cited evidence that two
Minden employees received Province stock options, but we have said that a
parent company’s offering a stock option plan to a subsidiary’s employees is
acceptable under IRS regulations and is not evidence of abnormal control over
the subsidiary.  Put simply, we find no
evidence of control other than that consistent with Province’s investor status
. . . .

Id. at 176 (citation omitted).  PHC-Minden demonstrates that there is no
bright-line rule for determining jurisdictional alter-ego status, and that it
takes more than some evidence of a close business relationship to disregard
formal corporate separateness.  See also Preussag Aktiengesellschaft v.
Coleman, 16 S.W.3d 110, 118, 123 (Tex. App.—Houston [1st Dist.] 2000, pet.
dism’d w.o.j.) (refusing to impute contacts between companies with allegedly “close
business relationship”).

The finding of no alter-ego status in PHC-Minden
can be contrasted with the opposite result in Cappuccitti v. Gulf Industrial Products, Inc., 222 S.W.3d 468 (Tex.
App.—Houston [1st Dist.] 2007, no pet.). 
Cappuccitti, a chemical industry businessman, incorporated two Bahamian
corporations on the same day.  Id. at 474.  He owned 100% of the parent company, which in
turn owned 90% of the subsidiary.  Id.  The
subsidiary entered into a business relationship with a Texas corporation that
manufactured chemicals used in mining.  Id. at 474–75.  When the subsidiary subsequently became
insolvent and failed to pay external debts, the Texas-based manufacturer sued
Cappuccitti’s parent company and Cappuccitti in his individual capacity, in addition
to the subsidiary with which it had a direct contractual relationship.  Id. at
480.  The subsidiary did not challenge
personal jurisdiction, but Cappuccitti and his parent company appealed from the
trial court’s denial of their special appearances.  Id.

This court affirmed denial of the special appearances, finding that the
plaintiff had presented sufficient proof to pierce the corporate veil for
jurisdictional purposes.  Id. at 484.  Cappuccitti was the president of both
corporations, the only employee of the parent corporation, and one of only two
employees of the subsidiary.  Id. at 474.  Both companies operated out of Cappuccitti’s
home.  Id.  The subsidiary company
directly paid Cappuccitti $10,000 per month as a “consultant,” and Cappuccitti
on at least one occasion covered the subsidiary’s bills with a check drawn on
his personal account.  Id. at 475.  As president of the
subsidiary, Cappuccitti negotiated with the Texas-based manufacturer to grant
valuable rights of first refusal to his wholly-owned parent company.  Id.  After the subsidiary company became insolvent,
Cappuccitti acted as president of both companies to transfer all the assets
from the subsidiary to the parent company for no value.  Id. at
476.  On these facts, this court concluded
that the plaintiff had met its burden in proving that Cappuccitti, the parent
company, and the subsidiary were alter egos of one another and therefore Texas
had personal jurisdiction over all of them. 
Id. at 484.

The jurisdiction-related facts in the present case more closely resemble
those in PHC-Minden than in Cappuccitti.  Mikuni and MAC maintain separate headquarters,
and there is no evidence that Mikuni and MAC commingle corporate assets.  Although deposition testimony suggested that
a loss to MAC would have “a negative impact” on the “books” of Mikuni because
it is a “consolidated company,” this evidence does not support a reasonable
inference that Mikuni considered MAC’s revenue as its own.  See BMC
Software, 83 S.W.3d at 799 (noting that referencing subsidiaries in annual
reports is “common business practice”).  Mikuni
does have control over MAC through its placement of employees on MAC’s board,
but this control is derivative of its status as an investor and the exercise of
valid shareholder rights.  See PHC-Minden, 235 S.W.3d at 176
(noting that conduct consistent with investor status is not “atypical control”).  MAC’s president testified at a deposition
that the Mikuni chairman does not tell him what to do on a day-to-day basis,
nor does he direct MAC regarding which market to sell into or which parts to
sell.  That the two companies share
marketing data and Mikuni sets some of MAC’s strategic priorities is not
unusual, since MAC is branded as a “Mikuni” company and regularly distributes
and manufactures Mikuni products.  That
said, MAC is more than a mere department of Mikuni, considering that MAC
distributes products manufactured by other companies, as well.

The totality of circumstances does not show that Mikuni exercises control
over MAC’s internal business operations in a manner that is inconsistent with
its status as an investor.  Cf. Alpine View Co. v. Atlas Copco AB,
205 F.3d 208, 218 (5th Cir. 2000) (examining jurisdictional alter-ego status
“based on a consideration of totality of the circumstances” to conclude that
atypical control was not established).  We
conclude that the evidence is legally insufficient to support imputation of
MAC’s jurisdictional contacts to Mikuni. 
Therefore, the presumption of corporate separateness has not been
overcome.

B.   Specific
jurisdiction

          CHT and the Fosters argue that the
trial court had enough proof before it to find that Mikuni is subject to
specific jurisdiction in a Texas court. 
To support their argument, they rely principally on the “stream of
commerce” jurisprudence of the Supreme Courts of Texas and the United States
addressing specific jurisdiction in the context of products liability
claims.  E.g., Asahi Metal Indus. Co.
v. Superior Court of Cal., 480 U.S. 102, 107 S. Ct. 1026 (1987); Spir Star AG v. Kimich, 310 S.W.3d 868
(Tex. 2010).

Texas courts generally follow the stream-of-commerce analysis in Justice
O’Connor’s plurality opinion in Asahi
Metal Industrial Co. v. Superior Court of California, 480 U.S. 102, 107 S.
Ct. 1026 (1987).  See Spir Star, 310 S.W.3d at 87. 
Justice O’Connor wrote:

The
“substantial connection” between the defendant and the forum State necessary
for a finding of minimum contacts must come about by an action of the defendant
purposefully directed toward the forum State. 
The placement of a product into the stream of commerce, without more, is
not an act of the defendant purposefully directed toward the forum State.  Additional conduct of the defendant may
indicate an intent or purpose to serve the market in the forum State, for
example, designing the product for the market in the forum State, advertising
in the forum State, establishing channels for providing regular advice to
customers in the forum State, or marketing the product through a distributor
who has agreed to serve as the sales agent in the forum State.  But a defendant’s awareness that the stream
of commerce may or will sweep the product into the forum State does not convert
the mere act of placing the product into the stream into an act purposefully
directed toward the forum State.

Asahi, 480 U.S. at 112, 107 S. Ct. at 1032 (emphasis and citations omitted).  Thus, for personal jurisdiction to extend to
a nonresident manufacturer, “the manufacturer must have intended to serve the
Texas market.”  Spir Star, 310 S.W.3d at 875.

          The Fosters and CHT argue that Mikuni
manifested its intent to serve the Texas market by selling to distributors that
sell into Texas.  They point to Mikuni’s
website, which states that the company markets its products to “almost all the
countries in the world,” including the United States.  By logical extension, they reason, Mikuni
markets to Texas.  They further argue
that Mikuni’s use of its California-based subsidiary to distribute products in
Texas proves that Mikuni intended to serve Texas along with the entire U.S.
market.  See Asahi, 480 U.S. at
112, 107 S.Ct. at 1032 (listing “marketing the product through a distributor
who has agreed to serve as the sales agent in the forum State” as conduct that
supports specific jurisdiction).  For the
proposition that intending to market to the entire United States manifests an
intent to market to a particular state, the Fosters and CHT rely principally on
two cases: LeBlanc v. Kyle, 28 S.W.3d
99, 104 (Tex. App.—Texarkana 2000, pet. denied) (finding personal jurisdiction
over foreign manufacturer when it contracted with an independent national distributor),
and Tobin v. Astra Pharmaceutical
Products, Inc., 993 F.2d 528, 544 (6th Cir. 1993) (rejecting notion that
foreign manufacturer could insulate itself from personal jurisdiction in all
fifty states by selling to an independent national distributor).

          A key fact distinguishes LeBlanc and Tobin from the present case. 
In each of those cases, the plaintiffs based their actions on products
that the foreign manufacturers had purposefully directed toward the U.S. market
through contractual relationships with national distributors.  See LeBlanc,
28 S.W.3d at 101; Tobin, 993 F.2d at
544.  By contrast, the Mikuni carburetor
installed on Foster’s motorcycle was not delivered by Mikuni to MAC for
distribution to the U.S. market. 
Instead, the carburetor at issue was sold by Mikuni to Kitaco, a
third-party company in Japan.  There is
nothing in the appellate record showing that Kitaco had a contractual
arrangement with Mikuni to distribute to the United States or to Texas, which would
be conduct that could support specific jurisdiction under the plaintiffs’
theory.  See Spir Star, 310 S.W.3d at 880 (finding personal jurisdiction
over foreign manufacturer when Texas-based distributor agreed to be its sales
agent in Texas).  Absent proof of such a
contractual arrangement, there was no purposeful availment by Mikuni, from
whose perspective it is entirely fortuitous that the stream of commerce carried
the carburetor at issue to Texas.  Fortuitous
contacts do not support personal jurisdiction. 
See Michiana, 168 S.W.3d at
785.

CHT and the Fosters cannot transfer Mikuni’s alleged intention to serve
the Texas market through MAC to whatever arrangement it had with Kitaco.  “[T]here must be a ‘substantial connection’
between the defendant’s contacts and the operative facts of the
litigation.”  Spir Star, 310 S.W.3d at 874. 
There is no “substantial connection” between Mikuni’s alleged intention
to sell carburetors to the Texas market through MAC and the carburetor that ended
up on Foster’s motorcycle.

          Alternatively, the trial court may
have found that Mikuni intended to serve the Texas market when it sold the
carburetor at issue to Kitaco.  However,
there is no evidence in the record to support this implied finding,
either.  At most, the trial court could
have inferred from the proof before it that Mikuni foresaw the carburetor
ending up in Texas after selling it to Kitaco, given that Kitaco sold
“thousands” of carburetors to CHT in Texas and MAC shared marketing data with
Mikuni.  However, “foreseeability alone
will not support personal jurisdiction.” 
CSR Ltd. v. Link, 925 S.W.2d
591, 595 (Tex. 1996).  

When, as here, the record contains no evidence that the nonresident
defendant took any act purposefully directed toward selling or distributing the
product at issue into Texas, specific jurisdiction cannot be exercised over the
defendant consistent with due process.  Id. at 596.  Mikuni’s representative swore in his
affidavit supporting the special appearance that “Mikuni Corporation does not
specifically target residents of the State of Texas and specifically does not
direct its business affairs to the State of Texas.”  With no other evidence in the record to
contradict this statement as it related to the carburetor at issue, Mikuni has
met its burden to negate specific jurisdiction on a “doing business”
theory.  See Kelly, 301 S.W.3d at 659. 
If the trial court found specific jurisdiction because Mikuni intended
to serve the Texas market when it sold the carburetor at issue to Kitaco, that
implied finding was error because no proof supported the implied finding and
the only proof on the matter contradicted it.

C.   General
jurisdiction

          CHT argues that the trial court could
have found general jurisdiction over Mikuni either based on Mikuni’s own
contacts with Texas, or based upon MAC’s contacts as imputed to Mikuni.  Because we have already concluded that MAC’s
forum contacts are not imputable to Mikuni, we will consider only whether
Mikuni is subject to the general jurisdiction of Texas based upon its own
contacts.

          CHT contends that multiple facts in
the record establish Mikuni’s “continuous and systematic contacts” with
Texas.  Mikuni Texas Company was
established in 1996, and it had an office in McAllen, Texas that oversaw
production of Mikuni products on the Mexican side of the border.  Though the Mikuni Texas Company ceased to exist
as an entity in 2003, the McAllen office remains active and five MAC employees
work there.  Mikuni board members, the
chairman, and employees have visited Texas and the United States in the
past.  Finally, thousands of Mikuni’s
carburetors are sold into Texas through CHT alone, and Mikuni probably knew
about the Texas sales through MAC’s marketing reports.  

The facts that CHT relies upon to show Mikuni’s alleged “continuous and
systematic contacts” are insufficient to establish general jurisdiction.  The Mikuni Texas Corporation was established
and wholly owned by MAC, not Mikuni. 
Also, the current workers at the McAllen office are employed by MAC, not
Mikuni.  The fact that Mikuni’s officers,
directors, and employees have occasionally visited Texas and the United States
does not subject Mikuni to general jurisdiction.  See
Helicopteros, 466 U.S. at 417, 104 S. Ct. at 1874 (“[P]urchases and related
trips, standing alone, are not a sufficient basis for a State’s assertion of
[general] jurisdiction”).  Finally, the
fact that Mikuni puts products into the stream of commerce leading to Texas is
only relevant to a specific jurisdiction analysis.  “Flow of a manufacturer’s products into the
forum . . . may bolster an affiliation germane to specific jurisdiction.  But ties serving to bolster the exercise of
specific jurisdiction do not warrant a determination that, based on those ties,
the forum has general jurisdiction
over a defendant.”  Goodyear Dunlop, 131 S. Ct. at 2849 (emphasis in original, citation
omitted).  Thus, CHT has indicated
insufficient contacts to establish general jurisdiction over Mikuni.

For a corporation, the “paradigm forum” for the exercise of general
jurisdiction is “one in which the corporation is fairly regarded as at
home.”  Id. at 2853–54.  Mikuni’s
affidavit states that Mikuni was incorporated in 1948 under the laws of Japan
and its principal place of business is Tokyo. 
Even if these facts were not enough to make Japan Mikuni’s home, there
is little to commend Texas as its home, since, according to Mikuni’s affidavit,
Mikuni is not registered to do business in Texas, has no directors, officers,
or employees in Texas, and does not own any assets in Texas.  Thus, Mikuni has negated the bases for
general jurisdiction in Texas.  See Kelly, 301 S.W.3d at 659.  To the extent the trial court may have found
general jurisdiction over Mikuni, that implied finding was erroneous because no
proof supported it and the only proof on the matter contradicted it.

III.          
Appellees’ request for remand and
additional discovery

          The appellees contend that if we
reverse the denial of Mikuni’s special appearance, we should remand the case
for further jurisdictional discovery.  In
the trial court, CHT moved for a continuance to conduct additional discovery,
and it moved to compel the deposition of Mikuni’s corporate
representative.  The appellate record
does not reflect that Mikuni was ever served with a proper corporate
representative deposition notice, describing “with reasonable particularity the
matters on which examination is requested,” see
Tex. R. Civ. P. 199.2(b)(1),
or that the trial court was ever provided the proposed deposition topics.  The court expressly denied CHT’s motion to
compel the deposition in a signed order, and it implicitly denied the continuance
by ruling in CHT’s favor against Mikuni’s special appearance.  CHT prays that this court remand the case
with instructions allowing CHT to “complete all necessary discovery regarding
Mikuni’s jurisdictional arguments and evidence,” although the only additional
discovery requested in the trial court was a corporate representative
deposition on unidentified topics.

          On an interlocutory appeal from a
denial of a special appearance, we will not disturb a trial court’s order
denying a motion concerning jurisdictional discovery unless the trial court
committed a clear abuse of discretion.  See BMC
Software, 83 S.W.3d at 800.  A trial
court abuses its discretion when it reaches a decision so arbitrary and
unreasonable as to amount to a clear and prejudicial error of law.  Id.

The appellees do not contend that the trial court’s denial of CHT’s
motion to compel an additional deposition was an abuse of discretion; they
simply contend that they should be afforded a further opportunity to take a
deposition in the hopes of undermining the evidence supporting Mikuni’s special
appearance.  Under the circumstances of
this case, in which the additional discovery was not properly requested in the
trial court, we find no abuse of discretion in the trial court’s discovery
ruling.  Accordingly, there is no reason
for a remand with respect to claims against Mikuni.  Cf.
Tex. R. App. P. 33.1.

Conclusion

          We reverse the trial
court’s order denying Mikuni’s special appearance and render judgment
dismissing the case against it for lack of personal jurisdiction.

 

 

 

                                                                   Michael
Massengale

                                                                   Justice


 

Panel
consists of Justices Keyes, Higley, and Massengale