

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-14-00827-CV

**PT INTERMEDIATE HOLDING, INC.** and Personal Touch Holding Corp.,
Appellants

v.

**LMS CONSULTING, LLC**,
Appellee

From the 45th Judicial District Court, Bexar County, Texas
Trial Court No. 2014-CI-00450
Honorable Peter Sakai, Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:    Karen Angelini, Justice
    Luz Elena D. Chapa, Justice
    Jason Pulliam, Justice

Delivered and Filed:  September 16, 2015

AFFIRMED

In this interlocutory appeal, PT Intermediate Holding, Inc. and Personal Touch Holding Corp. (collectively, "appellants") challenge the trial court's orders denying their special appearances in a suit brought against them by LMS Consulting, LLC ("appellee"). We affirm.

### BACKGROUND

PT Intermediate Holding is the parent corporation of two Texas corporations, PT Home Services of Dallas, Inc., and PT Home Services of San Antonio, Inc. (collectively, "the Texas entities"). The Texas entities provide home health care services in Texas.

Personal Touch Holding Corp. is the parent company of PT Intermediate Holding, and the "grandparent" of the Texas entities.

Appellee provides recruiting and staffing consulting services to businesses. In 2011 and 2012, appellee entered into more than twenty contracts under which it agreed to provide employee recruiting and staffing to the Texas entities and related health care agencies located in Weslaco and El Paso, Texas.

In 2014, appellee brought claims against the Texas entities and appellants for breach of contract and tortious interference with a contract. As to its breach of contract claims, appellee alleged it had entered into a series of contracts with a business known as "Personal Touch Home Care, Inc." to provide recruiting and staffing services to the Texas entities and related health care agencies located in Weslaco and El Paso, and the Texas entities breached their obligations to pay appellee under the contracts. Appellee further alleged that because of the control appellants exercised over the Texas entities, including control over the decisions to breach the contracts in question, appellants were liable for damages arising from the breach. As to its tortious interference claims, appellee alleged it had valid contracts with several third parties, and that the Texas entities and appellants willfully and intentionally interfered with those contracts by soliciting the third parties to terminate their contracts with appellee. Appellee acknowledged in its petition that appellants were nonresidents of Texas; however, appellee alleged that the trial court had personal jurisdiction over appellants because they had committed an intentional tort that was purposefully directed toward Texas, and because they had exerted control over the business operations of the Texas entities, and therefore, the activities of the Texas entities could be imputed to appellants for purposes of establishing minimum contacts.

Appellants, who are not Texas residents, filed special appearances claiming the trial court had no personal jurisdiction over them. Appellants asserted that they did not have sufficient

contacts with Texas to support the exercise of either specific or general jurisdiction over them; that the contacts or activities of the Texas entities could not be imputed to them; and that the exercise of personal jurisdiction over them would offend traditional notions of fair play and substantial justice. Appellee opposed the special appearances, arguing that the trial court had both specific and general jurisdiction over them because appellants were the alter egos of the Texas entities, controlling their internal business operations and affairs. The trial court held a hearing on the matter. The argument and evidence at the hearing centered on whether the contacts or activities of the Texas entities could be imputed to appellants for purposes of establishing personal jurisdiction. The trial court denied the special appearances.[1] Although requested, the trial court filed no findings of fact and conclusions of law. This appeal ensued.

## STANDARD OF REVIEW

Because personal jurisdiction over a nonresident defendant is a question of law, we review the trial court's ruling on a special appearance de novo. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007). When the trial court files no findings of fact and conclusions of law, we imply "all facts necessary to support [the ruling] and supported by the evidence." *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002).

## APPLICABLE PERSONAL JURISDICTION LAW

Personal jurisdiction involves a court's power to bind a particular person or party to a judgment. *CSR Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex. 1996). It flows from the Due Process Clause of the U.S. Constitution and protects a party from being bound to the judgment of a forum with which it has established no meaningful contacts, ties, or relations. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985).

---

[1] LMS Consulting, LLC also sued Personal-Touch Home Care of N.Y., Inc. The trial court granted the special appearance filed by Personal-Touch Home Care of N.Y., and the ruling was not appealed.

Texas courts may assert personal jurisdiction over a nonresident defendant if the Texas long-arm statute authorizes jurisdiction and the exercise of jurisdiction is consistent with federal and state due process standards. *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009). The Texas long-arm statute permits Texas courts to exercise jurisdiction over a nonresident defendant who "does business" in Texas. TEX. CIV. PRAC. & REM. CODE ANN. § 17.042 (West 2015). The statute lists some activities that constitute "doing business," but the list is not exclusive. *BMC Software*, 83 S.W.3d at 795. The statute's broad doing-business language allows the statute to reach as far as the federal constitutional requirements of due process will allow. *Moki Mac*, 221 S.W.3d at 575.

The exercise of jurisdiction is constitutional when two conditions are met: (1) the defendant has established minimum contacts with the forum state, and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Retamco*, 278 S.W.3d at 338. To establish minimum contacts, a defendant must "purposefully avail" itself of the privilege of conducting activities within Texas, thereby invoking the benefits and protections of its laws. *Id.* The defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being haled into a Texas court. *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002).

A nonresident defendant's minimum contacts may give rise to either specific or general jurisdiction. *Id.* Specific jurisdiction exists if the defendant's liability arises from or is related to an activity conducted within the forum. *BMC Software*, 83 S.W.3d at 796. In a specific jurisdiction inquiry, courts focus on the relationship among the defendant, the forum, and the litigation. *Retamco*, 278 S.W.3d at 338. A general jurisdiction inquiry is very different from a specific jurisdiction inquiry. *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 168 (Tex. 2007). General jurisdiction exists if a defendant's contacts with the forum are continuous and

systematic. *Id.* at 169. General jurisdiction requires a showing that the defendant conducted substantial activities within the forum, and permits the forum to exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to the defendant's activities in the forum. *CSR Ltd.*, 925 S.W.2d at 595.

Courts sometimes have personal jurisdiction over a nonresident defendant under an alter ego theory. This occurs when a foreign corporation and its subsidiary that does business in Texas have a relationship that allows a court to impute the subsidiary's "doing business" in Texas to the corporation. *BMC Software*, 83 S.W.3d at 798; *Jones v. Beech Aircraft Corp.*, 995 S.W.2d 767, 771 (Tex. App.—San Antonio 1999, pet. dism'd w.o.j.) ("[I]n some circumstances, a close relationship between a parent and its subsidiary may justify a finding that the parent 'does business' in a jurisdiction through the local activities of its subsidiaries."), *disapproved of on other grounds*, *BMC Software*, 83 S.W.3d at 794 n.1. The rationale for exercising such jurisdiction is that when a parent corporation exerts such domination and control over its subsidiary, they do not in reality constitute separate and distinct corporate entities but are one and the same corporation for purposes of jurisdiction. *BMC Software*, 83 S.W.3d at 798. To "fuse" a parent company and its subsidiary for jurisdictional purposes, a plaintiff must prove the parent controls the internal business operations and affairs of the subsidiary to the extent that the two entities effectively cease to be separate. *Id.* at 799.

### SPECIAL APPEARANCE BURDENS AND PROCEDURES

In a special appearance, the plaintiff has the initial burden of pleading allegations sufficient to bring a nonresident defendant within the provisions of the Texas long-arm statute. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010). When the plaintiff has pleaded sufficient jurisdictional allegations, the nonresident defendant seeking to avoid the court's jurisdiction has the burden of negating all bases of jurisdiction alleged by the plaintiff. *Id.* If the nonresident

defendant produces evidence negating personal jurisdiction, the burden then returns to the plaintiff to show as a matter of law that the court has personal jurisdiction over the plaintiff. *Oryx Capital Int'l Inc. v. Sage Apartments, L.L.C.*, 167 S.W.3d 432, 441 (Tex. App.—San Antonio 2005, no pet.). However, when a plaintiff alleges that personal jurisdiction exists under an alter ego theory, it has the burden of proving this allegation. *BMC Software*, 83 S.W.3d at 798-99. A court cannot find personal jurisdiction based on an alter ego theory unless the plaintiff proves its alter ego theory. *See id*. at 798. A trial court determines a special appearance from the pleadings, discovery, stipulations, affidavits, attachments, and oral testimony. TEX. R. CIV. PROC. 120a(3).

## ARGUMENTS PRESENTED ON APPEAL

In their briefing, appellants argue the trial court erred in denying their special appearances because appellee failed to establish that the trial court had specific jurisdiction or general jurisdiction over them. According to appellants, appellee failed to meet its burden to establish that the appellants controlled the internal business operations and affairs of the Texas entities, thereby allowing the activities of the Texas entities to be imputed to the appellants for the purpose of establishing minimum contacts with Texas. Appellants further argue that the trial court erred in denying their special appearances because the exercise of personal jurisdiction over them would offend traditional notions of fair play and substantial justice.

On the other hand, appellee maintains that the trial court properly denied appellants' special appearances. Appellee contends the appellants failed to negate all potential bases for jurisdiction asserted in its pleadings. Appellee also contends it met its burden to establish that the appellants controlled the internal business operations and affairs of the Texas entities, and therefore, the activities of the Texas entities were properly imputed to the Texas entities for purposes of establishing minimum contacts with Texas. Appellee finally contends that appellants failed to

establish that the exercise of personal jurisdiction over them would offend traditional notions of fair play and substantial justice.

## ALTER EGO THEORY

We first consider whether appellee met its burden to establish its alter ego theory for exercising personal jurisdiction over appellants. If appellee met its burden to show that appellants controlled the internal business operations and affairs of the Texas entities, then the activities of the Texas entities can be imputed to appellants for the purpose of establishing minimum contacts with Texas.

The crux of appellants' argument is that (1) they did not control the Texas entities, and (2) even if they did control the Texas entities, the level of control was insufficient to establish personal jurisdiction. Under the applicable standard of review, we must imply all facts necessary to support the trial court's ruling and supported by the evidence. *BMC Software*, 83 S.W.3d at 795.

As previously mentioned, to "fuse" the parent company and its subsidiary for jurisdictional purposes, a plaintiff must prove that the parent controls the internal business operations and affairs of the subsidiary. *BMC Software*, 83 S.W.3d at 799. The degree of control the parent exercises, however, must be greater than that normally associated with common ownership and directorship. *See PHC-Minden*, 235 S.W.3d at 175; *BMC Software*, 83 S.W.3d at 799. The evidence must show that the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice. *BMC Software*, 83 S.W.3d at 799. Examples of typical or appropriate parental involvement include monitoring the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies. *See PHC–Minden*, 235 S.W.3d at 176. The type of parental control that confers jurisdiction is evidenced by a "plus" factor: "something beyond the subsidiary's mere presence within the bosom of the corporate family." *Id*. There is no formula for determining whether the plaintiff has met its burden

of establishing that the parent controls the internal business operations and affairs of the subsidiary. Instead, courts examine all relevant facts and circumstances surrounding the operations of the parent and the subsidiary. *Id.* at 173.

Texas appellate courts have upheld jurisdictional alter ego findings by trial courts under a variety of circumstances. *See Landmark Land Co., Inc. v. Bennett*, No. 13-12-00117-CV, 2012 WL 4335294, at *9 (Tex. App.—Corpus Christi 2012, pet. denied); *Capital Tech. Information Serv., Inc. v. Arias*, 270 S.W.3d 741, 754-55 (Tex. App.—Dallas 2008, pet. denied); *Cappuccitti v. Gulf Industr. Prod., Inc.*, 222 S.W.3d 468, 483 (Tex. App.—Houston [1st Dist.] 2007, no pet.). For example, in *Landmark Land*, the appellate court concluded that there was some evidence that a nonresident parent corporation and its Texas subsidiary were fused for jurisdictional purposes. 2012 WL 4335294, at *9. Although the evidence indicated the parent and subsidiary maintained separate books and conducted separate meetings, the evidence also showed the subsidiary was wholly-owned by the parent, the subsidiary's franchise tax report showed it shared the same address with its nonresident parent, and its marketing flyers and website marketing deliberately obfuscated any distinction between the two entities. *Id.* at *8. In addition, the evidence showed that the parent exercised greater than normal control over its subsidiary in that (1) the parent made the decision that the subsidiary would purchase land and develop it as a golf course, and then approved decisions regarding golf course development; (2) the parent regularly held its shareholder meetings at a property owned and operated by its subsidiary; and (3) the parent's vice president oversaw the subsidiary's development project in his capacity as the parent's vice president. *Id.*

Similarly, in *Cappuccitti*, the appellate court concluded that an individual, a parent company, and a subsidiary were alter egos of one another and that the trial court had personal jurisdiction over all of them. 222 S.W.3d at 484. The facts in that case showed that Cappuccitti,

who was not a Texas resident, incorporated two Bahamian corporations. Cappuccitti owned 100% of the parent company, and the parent company owned 90% of the subsidiary. *Id*. at 482. The subsidiary formed a business relationship with a Texas corporation, and ultimately entered into a contract with it. *Id*. at 475. When a disagreement arose, the Texas corporation terminated the contract for non-performance, and filed suit against the subsidiary, its parent company, and Cappuccitti. *Id*. at 475-78. The parent company and Cappuccitti filed special appearances, which were denied by the trial court. *Id*. at 473. The appellate court concluded that the plaintiff had presented sufficient proof to pierce the corporate veil for jurisdictional purposes. *Id*. at 484. In reaching this conclusion, the appellate court cited evidence that Cappuccitti was the president of both corporations, the only employee of the parent corporation, and one of only two employees of the subsidiary; both companies operated out of Cappuccitti's home; the subsidiary company paid Cappuccitti $10,000.00 per month as a consultant; Cappuccitti negotiated with the Texas-based manufacturer to grant rights of first refusal to both companies; on at least one occasion, Cappuccitti paid the subsidiary's bills with a check drawn from his personal account; and Cappuccitti, the subsidiary, and the parent company were used interchangeably to transfer assets from one to the other, which rendered the subsidiary insolvent. *Id*. at 482-84.

On the other hand, in *PHC-Minden*, the Texas Supreme Court concluded the evidence failed to establish that the parent company and its subsidiary were fused for jurisdictional purposes. 235 S.W.3d at 176. In *PHC-Minden*, the evidence showed that the parent company and its subsidiary maintained separate headquarters, that the subsidiary's board approved the subsidiary's budget and oversaw its day-to-day operations, that the subsidiary established its policies and procedures for providing health care to patients, that the parent and subsidiary shared no directors, and that the parent was not involved in recruiting the physicians that worked for the subsidiary. *Id*. There were a few areas, however, where the functions of the parent and subsidiary overlapped. For

example, the parent provided general liability insurance for the subsidiary and group health insurance for its employees, but the evidence showed the policies were funded from the subsidiary's revenues. *Id*. Additionally, several of the subsidiary's employees received their paychecks from the parent; however, the salaries were intercompany payables, which again meant that the monies came from the subsidiary's revenues. *Id*. Based on this evidence, the Texas Supreme Court concluded there was no evidence of abnormal control by the parent company over the subsidiary, and therefore, the Texas contacts of the parent could not be imputed to the subsidiary. *Id*.

Turning to the present case, we note that appellee asserted its alter ego theory both in its live pleading and in its written responses to appellants' special appearances. Appellee maintained that appellants controlled or supervised various aspects of the internal operations of the Texas entities and that this control over the internal operations and business affairs exceeded typical parental involvement. Specifically, appellee asserted that appellants: (1) oversaw or made personnel decisions for the Texas entities; (2) made payments to vendors for the Texas entities; (3) managed and issued payment for payroll of the Texas entities; (4) managed and controlled the website that promoted the Texas entities; (5) retained authority to disapprove any contracts of the Texas entities; (6) shared corporate offices with the Texas entities; (7) shared common directors and officers with the Texas entities; (8) controlled and managed employee benefits for employees of the Texas entities; and (9) oversaw billing and collection for the Texas entities. To establish that appellants controlled the internal business operations and affairs of the Texas entities, appellee cited deposition testimony, affidavits, and other documents, including responses to discovery.

In denying the special appearances, the trial court made an implied finding that appellants controlled the internal business operations and affairs of the Texas entities, and that the degree of

control was greater than that normally associated with common ownership and directorship. We now review the record to determine whether there was evidence to support this finding.

### 1. Balk Deposition

In her deposition, Dr. Trudy Balk testified that she was the vice-president of operations for PT Home Services of San Antonio, Inc., and PT Home Services of Dallas, Inc., and other Personal-Touch Home Care companies located in New York, Pennsylvania, Virginia, Maryland, Ohio, Kentucky, Indiana, New Hampshire, and Massachusetts. Balk did not receive compensation from any of those entities; she received her compensation from the grandparent company, Personal Touch Holding. Balk supervised most of the offices directly, including "oversee[ing] the operations in terms of regulatory changes," "clinical changes, financial changes that have to be made, [and] personnel, for sure." When asked if she was vice president of operations for the parent company, PT Intermediate Holding, Balk stated she was vice president of operations "for the entities." Initially, when asked if she provided any services for the grandparent company, Personal Touch Holding, Balk stated, "It's a holding corp. I work for the parent." Balk later clarified that she was the vice president of operations for the grandparent company.

Balk acknowledged that the Texas entities, and some of their "branches"—Weslaco and El Paso—entered into staffing and recruiting agreements with appellee. Balk did not read or approve the agreements before they were executed. The agreements were signed by Elizabeth De La Rosa, the regional administrator for the Texas offices. Balk stated that although De La Rosa had a lot of autonomy, she was not authorized to execute legal agreements.

Balk testified that she was familiar with the website address, www.pthomecare.com. The website, which was under Balk's control, was used by all of the Personal-Touch Home Care offices. Balk said the website listed the contact address for the Texas locations as "222-15 in Bayside, New York." Balk confirmed this was the correct address because it was the location of

the corporate office. Balk also acknowledged that the name for each of the Texas locations was listed on the website as "Personal-Touch Home Care, Inc." Balk further stated that it was a mistake to use the name "Personal-Touch Home Care, Inc." to refer to the Texas entities, and it had recently been corrected.

According to Balk, PT Intermediate Holding was the parent company to all of the other companies, and had been since 2010 or 2011. The directors of PT Intermediate Holding were Robert Marx and Dr. Glaubach; Balk was an officer but not a director. Balk testified that PT Intermediate Holding Inc., was "owned by Personal-Touch Holding Company, which is all the companies."

When asked if Personal-Touch of Dallas, Inc. provided any employee benefits such as health insurance, Balk stated that "as a company, we provide health benefits to all our employees." The insurance was handled by the corporate office, which negotiated the contracts with the insurance companies, but the cost of the insurance was paid for by each of the entities. Balk clarified that when she referred to the corporate office she meant the parent company, PT Intermediate Holding. Balk said that each of the individual entities was responsible for marketing, but "there can be input" from the parent company. Balk also testified that PT Intermediate Holding provided billing services for the Texas entities. Specifically, the billing was done by the entity itself, and then it went to corporate where the files were disbursed. The actual billing for the Texas entities was done locally. Similarly, as to payroll, Balk said each of the individual entities "input" the payroll information, and then the payroll checks were paid by PT Intermediate Holding and attributed to each of the companies. Balk further indicated the Texas entities had retirement benefits, namely a 401(k) program that was administered by the grandparent company, Personal Touch Holding.

### 2. *Discovery Responses*

In a response to appellee's interrogatories, Personal Touch Home Care of New York, Inc. listed the principal office address for the Texas entities as "222-15 Northern Boulevard, Bayside, New York 11361," and the principal office address for PT Intermediate Holding as "222-15 Northern Blvd., 3rd Floor, Bayside, New York 11361."

### 3. *Shane Affidavit*

In an affidavit, appellee's chief executive manager, Jesse Shane, testified that between June 2011 and October 2012, appellee entered into no less than twenty staffing and recruiting agreements with a company holding itself out as and/or doing business as "Personal-Touch Home Care, Inc." The agreements were authorized by Elizabeth De La Rosa, an authorized officer/administrator for "Personal-Touch Home Care, Inc.," and were applicable to various offices of Personal-Touch Home Care, Inc. located in Texas, namely, Dallas, San Antonio, Weslaco, and El Paso.

Shane further testified that he was informed on numerous occasions by De La Rosa and others that Balk worked in the New York corporate office, managed the Texas operations, and De La Rosa reported to Balk. Shane stated that on numerous occasions during 2011, 2012, and 2013, De La Rosa informed him that Balk had decided that the company would not pay certain recruiting fees that fell under the agreements. De La Rosa also informed him that payments, invoices, and related operations for the Texas entities were controlled and processed through the corporate office in New York. Shane also stated that he was informed that the Texas entities had to obtain approval from "the New York corporate office" before hiring certain recruits or staff brought to them by appellee under the agreements, and that checks over a certain dollar amount had to be approved by the corporate office in New York. According to Shane, payments made on invoices from appellee to the Texas entities were paid by checks purporting to be from "Personal Touch Home

Aides," and the address listed on the checks was "222-15 Northern Boulevard, Bayside, New York 11361."

Finally, Shane testified that the website address for the company that entered into the staffing/recruiting agreements with appellee was www.pthomecare.com. When the contracts were executed, and as of the date of Shane's affidavit, the website listed the contact address for "Personal Touch Home Care, Inc." as "222-15 Northern Blvd., 3rd Floor Bayside, NY 11361."

### 4. Emails

The record also contained emails indicating that appellants made personnel decisions for the Texas entities. In an email dated October 20, 2011, De La Rosa explained to one of appellee's employees that she could not proceed with hiring a candidate for a nurse's position for one of the Texas entities because "one of the owners in New York" had a niece who was considering the position. De La Rosa went on to state, "I have never met her, nor seen her, nor talked with her on the phone. In six years this is a first for me … If this corporate plan falls through I want to go with [the applicant you recommended] …." In an email dated August 16, 2012, Cris Trevino, another manager for one of the Texas entities, told one of appellee's employees that she would not be hiring an applicant recommended by appellee for a billing specialist position in El Paso. Trevino stated "corporate will not let me hire her … I really liked [the applicant] for the job but [] it is not my decision." A few days later, one of appellee's employees inquired about setting up an interview for a billing specialist position, and Trevino responded that she was "having to send all resumes to corporate before we set up interviews." About two months later, in an email dated October 26, 2012, Trevino advised one of appellee's employees that "corporate" had approved an applicant and the applicant was set to begin training in San Antonio the following week. And finally, during the same month, Trevino sent another email referring to an interview that had been set up by "the head hunter from corporate."

The following factors have been identified as important to determining whether a subsidiary is separate and distinct from its parent corporation for personal jurisdiction purposes: (1) the amount of the subsidiary's stock owned by the parent corporation; (2) the existence of separate headquarters; (3) the observance of corporate formalities; and (4) the degree of the parent's control over the general policy and administration of the subsidiary. *PHC-Minden*, 235 S.W.3d at 175. In this case, evidence was presented concerning all of these factors except the observance of corporate formalities. First, the evidence showed the Texas entities were wholly owned subsidiaries of PT Intermediate Holding, and PT Intermediate Holding was wholly owned by Personal Touch Holding. Second, there was some evidence, namely in the discovery responses and the testimony about the website, indicating PT Intermediate Holding and the Texas entities shared the same corporate headquarters. Finally, there was evidence that the appellants had a high level of control over the general policy and administration of the Texas entities. As to recruiting and hiring, this control was extensive. Balk stated in her deposition that she was involved in the Texas entities' personnel decisions, and the emails indicated that appellants had complete control over hiring for the Texas entities. Appellants also exercised extensive control over some of the Texas entities' financial decisions. Shane testified that checks over a certain dollar amount had to be approved by appellants, and that appellants decided whether or not appellee would be paid on some of its invoices. Appellants controlled a common website for the Texas entities, and this website identified all of the subsidiaries, including the Texas entities, under a common name "Personal Touch Home Care, Inc."

After considering all relevant facts and circumstances surrounding the operations of the parents and the subsidiaries in this case, we conclude there was some evidence to support the trial court's implied finding that appellants exercised a degree of control over the Texas entities that was greater than that normally associated with common ownership and directorship. Because

appellee met its burden to show that appellants controlled the internal business operations and affairs of the Texas entities, the trial court properly imputed the activities of the Texas entities to appellants for purposes of establishing minimum contacts.

For obvious reasons, the Texas entities did not contest the exercise of personal jurisdiction over them. Thus, once the activities of the Texas entities were imputed to appellants, appellants' contacts with Texas were sufficient to permit the trial court to exercise personal jurisdiction over appellants. *See PHC-Minden*, 235 S.W.3d at 168 (recognizing that to establish general jurisdiction, a defendant must be engaged in longstanding business in the forum state, such as marketing or shipping products, or performing services or maintaining one or more offices there); *Cappuccitti*, 222 S.W.3d at 481 (providing that once the contacts of a subsidiary that did not contest personal jurisdiction were imputed to its nonresident parent corporation under an alter ego theory, the trial court properly exercised personal jurisdiction over the nonresident parent corporation). We conclude the trial court properly concluded that it had personal jurisdiction over appellants.

### TRADITIONAL NOTIONS OF FAIR PLAY AND SUBSTANTIAL JUSTICE

Appellants further argue that the trial court erred in denying their special appearances because the exercise of personal jurisdiction would offend traditional notions of fair play and substantial justice. Even when a parent and a subsidiary are fused for jurisdictional purposes, the trial court's exercise of personal jurisdiction over a nonresident defendant must comport with traditional notions of fair play and substantial justice. *Capital Tech*., 270 S.W.3d at 755. To evaluate this component, we consider the nonresident's contacts in light of (1) the burden on the defendant, (2) the interests of the forum state in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Spir Star AG v. Kimich*, 310 S.W.3d 868, 878

(Tex. 2010). To defeat jurisdiction, appellants must present a compelling case that the exercise of jurisdiction would be unreasonable. *Id*. at 878-79. "Only in rare cases . . . will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Guardian Royal Exchange Assur., Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 231 (Tex. 1991).

In their brief, appellants claim that the exercise of personal jurisdiction over them would offend traditional notions of fair play and substantial justice because they have their principal places of business in New York and no operations in Texas. Based on this claim, appellants assert they would be uniquely burdened by litigating this case in Texas. We disagree. "Distance alone cannot ordinarily defeat jurisdiction." *Moncrief Oil Int'l v. OAO Gazprom*, 414 S.W.3d 142, 155 (Tex. 2013). Any burden on appellants would be minimal, particularly in light of the presence of their subsidiaries in Texas. *See id*. Furthermore, appellee has an interest in resolving all of its related claims in a single proceeding. And, it would be inefficient for the interstate justice system to require appellee pursue virtually identical claims in two states. In sum, any possible burden on appellants would be outweighed by the burden on appellee and the interstate justice system. We conclude the exercise of personal jurisdiction over appellants comports with traditional notions of fair play and substantial justice.

## CONCLUSION

For these reasons, the trial court's orders denying appellants' special appearances are affirmed.

Karen Angelini, Justice