**Affirmed and Memorandum Opinion filed August 18, 2020.**



**In The**

## Fourteenth Court of Appeals

---

### NO. 14-19-00715-CV

---

**BOOTH CREEK MANAGEMENT CORPORATION, Appellant**

**V.**

**NEW EXECUTIVE GROUP LIMITED, TRANSAMERICA INVESTMENT GROUP, INC., AND JOHN BERRY, Appellees**

---

**On Appeal from the 165th District Court
Harris County, Texas
Trial Court Cause No. 2016-24794**

---

### MEMORANDUM OPINION

Appellant/defendant Booth Creek Management Corporation appeals the denial of its special appearance. Appellees/plaintiffs New Executive Group, Transamerica Investment Group, and John Berry (collectively, the "Berry Parties") sued ANS Funding Corporation, Darren DesVeaux, Booth Creek Management Corporation, and George N. Gillett, Jr. seeking to recover damages after an investment the Berry Parties allege was fraudulent failed. Booth Creek filed a special

appearance, which the trial court denied.

Booth Creek challenges the trial court's order in a single issue on appeal arguing that Booth Creek lacks sufficient contacts with Texas, Gillett is not Booth Creek's alter ego, and subjecting Booth Creek to jurisdiction in Texas would violate traditional notions of fair play and substantial justice. The jurisdictional evidence is legally and factually sufficient to support the trial court's implied finding that Booth Creek is Gillett's alter ego for jurisdictional purposes, and subjecting Booth Creek to jurisdiction in Texas does not violate traditional notions of fair play and substantial justice. Therefore, we overrule Booth Creek's issue, and we affirm the trial court's order denying Booth Creek's special appearance.

## BACKGROUND

### I. The individuals and entities involved

The underlying dispute centers around an international financing arrangement in which George Gillett and Darren DesVeaux sought to obtain two letters of credit, each in the amount of €750 million. There was no stated purpose for the letters of credit other than to arrange for them to be discounted by New Executive Group ("NEG") to provide funds for Gillett to use in an international transaction. Gillett is the sole owner of Booth Creek Management Corporation, one of the defendants in the trial court. DesVeaux is the President and sole owner of defendant ANS Funding Corporation. According to Gillett the transaction was proposed by Sven Reckeweg working with Prince Khalid al Kharifi, a member of the Saudi royal family. DesVeaux engaged John Berry to help obtain the letters of credit due to Berry's relationship with BBVA Compass Bank. John Berry created NEG, a Texas Limited Partnership, to be the payee on the letters of credit.

2

## II. The Discounting Agreements

ANS, represented by DesVeaux, and NEG, represented by Berry, signed two Letter of Credit Discounting Agreements (the "Discounting Agreements"). In the Discounting Agreements, ANS and NEG agreed that ANS would provide "certain irrevocable, unconditional, and confirmed letter[s] of credit to NEG as sole beneficiary in support of raising liquidity and capital for its ongoing business operations and expansion." Each letter of credit was to be in the amount of €750 million. ANS further agreed to engage the services of NEG "in order to receive, negotiate, and credit" the letter of credit by providing payments to ANS. ANS agreed to pay Transamerica Investment Group ("TIG") an initial retainer deposit equal to €750,000 for each letter of credit. ANS further agreed to pay NEG a one percent termination fee in the event the letters of credit were not delivered to NEG or the agreement was terminated. After the letters of credit were to be delivered, NEG agreed to pay ANS 85% of the face value of each letter of credit.

The Discounting Agreements also contained a forum selection clause in which the parties agreed that the agreements would be "interpreted, construed and enforced in accordance with, and the validity and performance hereof shall be governed exclusively by the laws of the State of Texas with mutually agreed exclusive venue being vested in the state district courts of Harris County, Texas."

## III. The Acknowledgements

In connection with the transaction Gillett signed, in his individual capacity, an "Acknowledgement, Agreement and Disclosure of Beneficial Interest" acknowledging the Discounting Agreements (the "Acknowledgment") in which Gillett "disclose[d] having made independent arrangements for the issuance and delivery of two (2) Letters of Credit to NEG on behalf of ANS (each an "LC")." The Acknowledgement further stated that each Letter of Credit would be in the face

3

amount of €750 million and issued by BBVA Bank—Spain. The Acknowledgement stated that 85% of the face amount of each Letter of Credit was to be disbursed to ANS by NEG according to the terms and conditions of each contract and pursuant to the written instructions of Gillett.

## IV. The Dispute

The transaction contemplated by the Discounting Agreements did not come to fruition. The electronic representation purportedly tracking the letters of credit, known as a SWIFT transcript, was not authentic. In addition, Gillett received purported letters of credit from Reckeweg, which he later learned were "fake." Gillett forwarded the fake letters of credit to Berry. When the financial transaction did not happen the Berry Parties sued ANS, Booth Creek, and Gillett for breach of contract, fraudulent inducement, and fraud.

In the Berry Parties' fifth amended petition, the live pleading upon which the trial court based its ruling on Booth Creek's special appearance, the Berry Parties alleged that Gillett presented false letters of credit to John Berry with the expectation that Berry would present those false letters of credit to the bank and pay Gillett 85% of €750 million. The Berry Parties also alleged that Gillett relied on Sven Reckeweg and Khalid al Kharifi as agents to secure the letters of credit. The Berry Parties alleged that Booth Creek paid Reckeweg advances on the "success fees" to be paid in relation to the failed transaction. The Berry Parties further alleged that Booth Creek was the alter ego of Gillett and, as such, Booth Creek was responsible for Gillett's actions.

## V. The Special Appearance

Gillett has not contested the trial court's exercise of personal jurisdiction over him individually. Booth Creek filed a special appearance objecting to personal

jurisdiction in Texas. Booth Creek asserted it was a Delaware corporation with its principal place of business in Vail, Colorado. Booth Creek further asserted that it had no offices, employees, or agents in Texas and did not do business in Texas.

Booth Creek argued that the Berry Parties failed to allege facts to support personal jurisdiction under the jurisdictional veil-piercing analysis. In support of its special appearance, Booth Creek attached (1) the affidavit of Brian Pope, Vice President of Finance and Accounting and Chief Financial Officer for Booth Creek; (2) excerpts from Gillett's deposition; (3) excerpts from the deposition of Lisa Tew, Gillett's assistant at Booth Creek; and (4) excerpts from Pope's deposition.

In Pope's affidavit he averred that he was Vice President of Finance and Accounting for Booth Creek Management Corporation. Pope stated that Booth Creek had no involvement in the failed financial transaction. Pope averred that while Booth Creek managed certain holdings of Gillett, it maintained bank accounts separate from those maintained by Gillett and had not commingled funds with Gillett. Pope further stated that Booth Creek observed corporate formalities and Gillett exercised the degree of control that is typical of a chairman of the board and owner who does not have day-to-day duties with the company.

The Berry Parties responded to Booth Creek's special appearance by arguing that as Gillett's alter ego, Booth Creek was subject to the Texas court's jurisdiction. Attached to The Berry Parties' response were (1) Pope's deposition; (2) Gillett's deposition; (3) Tew's deposition; (4) a copy of Gillett's executive biography from Booth Creek's website; (5) an email showing purchase of travel by Booth Creek's travel consultant; (6) copies of the Acknowledgements; and (7) copies of email conversations between Gillett and Berry regarding the letters of credit.

In Pope's deposition he explained his "three isolated incidents of involvement" in the transactions that formed the basis of this suit. Pope testified that

5

Reckeweg was working to obtain the letters of credit on Gillett's behalf. Gillett asked Pope to review the Acknowledgements before Gillett signed them. Pope was also part of a conference call, although not a direct participant, between Gillett, Berry, and DesVeaux in which "intake fees" for the letters of credit were discussed. Pope's third point of involvement was in "drafting an e-mail [after the false letters of credit were sent] to seek to get to the bottom of what was transpiring."

Pope testified in his deposition that Booth Creek is owned 100% by Gillett. Gillett accepts a nominal salary in addition to distributions from Booth Creek. Gillett did not maintain a separate office or mailing address from Booth Creek. All of Gillett's businesses were run from the Booth Creek address, which was listed on the Acknowledgements. Booth Creek did not hold formal board or business meetings. Pope testified that Andrew Rogul was bringing "capital-raising opportunities to [Gillett]" and was being paid by Booth Creek. Rogul's capital-raising opportunities were for Gillett's personal benefit despite the fact that Booth Creek paid Rogul. Pope recorded payments to Rogul and Reckeweg as business expenses to Booth Creek. This evidence was not disputed.

Gillett testified that the false letters of credit were sent to him by Reckeweg, who was Gillett's agent. The letters of credit contained a cover letter stating that they had been retyped. Gillett denied having forwarded the false letters of credit as authentic but admitted instructing Tew to forward the letters of credit to Berry.

Gillett testified in his deposition that the payments to Reckeweg were strictly personal to Gillett but admitted the payments were made by Booth Creek because Gillett does not have "accounts that [he] can send money out of." Gillett testified that all of his personal money was in Booth Creek. Gillett confirmed that Booth Creek paid Rogul in regard to the underlying transaction; Rogul introduced Gillett to DesVeaux. Gillett authorized Tew, a Booth Creek employee, to sign the

6

Acknowledgements on his behalf.

Tew testified that she worked as an assistant at Booth Creek in a family office for Gillett, Pope, and Eric Thomas, the Booth Creek accountant. As of the date of Tew's deposition in late 2016, Booth Creek had only three employees, which were Pope, Thomas, and Tew.

Two hearings were held on Booth Creek's special appearance. After the first hearing the Berry Parties filed their fifth amended petition. After the second hearing, by agreement of counsel, Booth Creek filed an amended special appearance and the Berry Parties filed a supplement to their fifth amended petition. The trial court further permitted filing of an amended response and reply to the amended special appearance.

Attached to the Berry Parties' amended special appearance was a report from Rob Hancock, an accountant designated as an expert. The report noted that Hancock had been retained to review the Discounting Agreements and quantify economic damages sustained by the Berry Parties. Hancock was also retained to "evaluate the interlocking financial relationships between Defendants Booth Creek and Gillett." As to the latter issue, Hancock opined:

> Based on my review of the evidence provided to me, it is my opinion that Booth Creek and George Gillett, Jr. appear as one and the same and operate as alter egos of each. It appears that Booth Creek and George Gillett have i) not kept their property separate, ii) failed to keep accurate books and records, iii) exhibited control and domination over each other, and iv) indiscriminately used the property of one another on a non-arms' length basis.

After considering all documents on file, the trial court denied Booth Creek's special appearance. No findings of fact or conclusions of law were filed.

ANALYSIS

In a single issue, Booth Creek argues the trial court erred in denying its special appearance.

## I.      Standard of Review and Applicable Law

Whether a court has personal jurisdiction over a defendant is a question of law. *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 805–06 (Tex. 2002). The trial court's decision to grant or deny a special appearance is subject to de novo review on appeal. *Id*. at 806. However, the trial court's factual findings supporting its ruling on the special appearance may be challenged for legal and factual sufficiency. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). When, as here, the trial court did not issue findings of fact, all facts necessary to support the trial court's ruling and supported by the evidence are implied in favor of the trial court's ruling. *Watamar Holding S.A. v. SFM Holdings, S.A.*, 583 S.W.3d 318, 325 (Tex. App.—Houston [14th Dist.] 2019, no pet.). When the appellate record includes the reporter's and clerk's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency. *BMC Software*, 83 S.W.3d at 795.

When examining a legal-sufficiency challenge, we review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a reasonable fact finder could, and disregard contrary evidence unless a reasonable fact finder could not. *Id*. at 827. The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the verdict under review. *Id*. The fact finder is the sole judge of witness credibility and the weight to give their testimony. *See id*. at 819.

In a factual-sufficiency review, we consider and weigh all the evidence, both supporting and contradicting the finding. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998). We set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.* at 407. We may not substitute our own judgment for that of the trier of fact or pass upon the credibility of the witnesses. *Id.*

Texas courts may exercise personal jurisdiction over a nonresident if "(1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees." *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007) *see also* Tex. Civ. Prac. & Rem. Code § 17.042. Under the Texas long-arm statute, the plaintiffs bear the initial burden of pleading allegations sufficient to confer jurisdiction. *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009). When the plaintiffs meet this initial burden, the burden shifts to the defendant to negate all potential bases for personal jurisdiction pleaded by the plaintiffs. *Id.*

The long-arm statute permits Texas courts to exercise personal jurisdiction over a nonresident defendant that "does business" in Texas. Tex. Civ. Prac. & Rem. Code § 17.042; *BMC Software*, 83 S.W.3d at 795. The statute lists three activities that constitute "doing business": (1) contracting with a Texas resident when either party is to perform the contract in whole or in part in Texas; (2) committing a tort in whole or in part in Texas; and (3) recruiting Texas residents for employment inside or outside of Texas. Tex. Civ. Prac. & Rem. Code § 17.042. This list, however, is not exclusive, and the statute's "doing business" requirement is limited only by the requirements of federal due process guarantees. *Cappuccitti v. Gulf Indus. Products, Inc.*, 222 S.W.3d 468, 479 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

With respect to personal jurisdiction, federal due process requires two things. First, the nonresident defendant must have purposefully established such minimum contacts with the forum state that the defendant could reasonably anticipate being sued there. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985). A nonresident establishes minimum contacts with Texas by purposefully availing itself of the privileges and benefits inherent in conducting business in the state. *BMC Software*, 83 S.W.3d at 795.

The minimum contacts element of due process is further divided into general and specific personal jurisdiction. *Moki Mac*, 221 S.W.3d at 575. Specific jurisdiction exists when the claims in question arise from or relate to the defendant's purposeful contacts with Texas. *Am. Type Culture Collection*, 83 S.W.3d at 807. In conducting a specific-jurisdiction analysis, we focus on the relationship among the defendants, Texas, and the litigation. *See Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 228 (Tex. 1991). For a nonresident defendant's contacts with Texas to support an exercise of specific jurisdiction, there must be a substantial connection between the defendant's purposeful contacts with Texas and the operative facts of the litigation. *See Moki Mac*, 221 S.W.3d at 585.

General jurisdiction, however, implicates a more demanding minimum-contacts analysis, requiring a showing that the defendants conducted substantial activities within the forum. *CSR, Ltd. v. Link*, 925 S.W.2d 591, 595 (Tex. 1996) (orig. proceeding). General jurisdiction exists when a defendant has "continuous and systematic general business contacts" with Texas so that Texas courts may exercise personal jurisdiction over the defendant even if the plaintiff's claims did not arise from or relate to the defendant's activities purposefully directed to Texas. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–16 (1984); *Am. Type Culture Collection*, 83 S.W.3d at 809–10.

Second, if the nonresident defendant has purposefully established minimum contacts with the forum, the exercise of personal jurisdiction must also comport with traditional notions of fair play and substantial justice. *Burger King*, 471 U.S. at 475–76. As to fairness, the defendant bears the burden of presenting a "compelling case" that exercising jurisdiction over him would not be fair and just. *Guardian Royal*, 815 S.W.2d at 231. Only in rare cases, however, will a Texas court's exercise of personal jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state. *Id.*

## II.  Sufficient evidence supports the trial court's implied finding that Booth Creek is Gillett's alter ego for personal-jurisdiction purposes.

Booth Creek argues the trial court erred in denying its special appearance because (1) Booth Creek lacks sufficient contacts with Texas to confer general jurisdiction over it; (2) Booth Creek lacks sufficient contacts with Texas related to the operative facts of the litigation to confer specific jurisdiction; (3) jurisdictional veil piercing is inappropriate based on the factors articulated by the Texas Supreme Court; and (4) forcing Booth Creek to defend itself in Texas would violate traditional notions of fair play and justice.

By denying Booth Creek's special appearance, the trial court impliedly found that Booth Creek and its owner, Gillett, are alter egos for personal-jurisdiction purposes. *See BMC Software*, 83 S.W.3d at 795. The trial court may exercise personal jurisdiction over Booth Creek if the relationship between Booth Creek and Gillett would allow the Texas courts to impute Gillett's Texas contacts to Booth Creek. *See PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 173 (Tex. 2007); *Wormald v. Villarina*, 543 S.W.3d 315, 321–22 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (noting that legal standard from *PHC-Minden* case applies when plaintiff asserts that natural person is an alter ego of a corporate entity that the natural

11

person owns). The rationale for doing so is that Gillett exerts such domination and control over Booth Creek that the two do not in reality constitute separate and distinct legal persons but are one and the same legal person for personal-jurisdiction purposes. *See PHC-Minden*, 235 S.W.3d at 173. Texas law presumes that Gillett and Booth Creek are separate legal persons, and therefore the Berry Parties had the burden of proving that Texas courts should treat Gillett and Booth Creek as alter egos for personal-jurisdiction purposes. *See id.* Direct and reverse veil piercing are appropriate (1) where a corporation is organized and operated as a mere tool or business conduit of another; and (2) there is such "unity between corporation and individual that the separateness of the corporation has ceased" and holding only the corporation or individual liable would result in injustice. *Richard Nugent & CAO, Inc. v. Estate of Ellickson*, 543 S.W.3d 243, 266 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (citing *Castleberry v. Branscum*, 721 S.W.2d 270, 271 (Tex. 1986)). Courts will not disregard the corporate fiction and pierce the corporate veil absent exceptional circumstances. *See Lucas v. Tex. Indus., Inc.*, 696 S.W.2d 372, 374 (Tex. 1984).

The legal standard for piercing the corporate veil between the entity and its owner for personal-jurisdiction purposes differs from the legal standard for piercing the corporate veil between the entity and its owner for liability purposes. *See PHC-Minden*, 235 S.W.3d at 174. The different standard makes sense given that personal jurisdiction involves due-process considerations that may not be overridden by statutes or the common law. *See id.* For this reason, fraud—a finding of which would be vital to piercing the corporate veil under section 21.223 of the Business Organizations Code—has no place in determining whether Gillett and Booth Creek are alter egos for personal-jurisdiction purposes. *See* Tex. Bus. Orgs. Code Ann. § 21.223; *PHC-Minden*, 235 S.W.3d at 175. Similarly, some of the factors courts

consider in determining whether an entity may be held liable under a veil-piercing theory hold no relevance to an alter-ego analysis for personal-jurisdiction purposes. *See PHC-Minden*, 235 S.W.3d at 175.

Instead, to "fuse" Gillett and Booth Creek for personal-jurisdiction purposes, the Berry Parties had to prove that Gillett controls the internal business operations and affairs of Booth Creek to a degree greater than that normally associated with ownership of a corporation, and the evidence must show that Gillett and Booth Creek ceased to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice. *See id.* The Supreme Court of Texas has indicated that in deciding whether Booth Creek and Gillett are alter egos for personal-jurisdiction purposes, Texas courts should determine whether Booth Creek is "separate and distinct" from Gillett, taking into account the amount of Booth Creek's stock owned by Gillett, the observance of corporate formalities, and the degree of Gillett's control over Booth Creek's general policy and administration. *See id.* This court has used the standard for jurisdictional veil-piercing of the corporate veil between a parent company and a subsidiary company to assess jurisdictional veil-piercing as between an individual and a corporation. *See Wormald*, 543 S.W.3d at 322 (citing *Greenfield Energy, Inc. v. Duprey*, 252 S.W.3d 721, 731 (Tex. App.—Houston [14th Dist.] 2008, no pet.)).

To determine whether an alter ego relationship exists for jurisdictional purposes, courts look to the total dealings of the corporation and the individual, including the degree to which corporate and individual property have been kept separate, the amount of financial interest, ownership, and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes. *Wilmington Tr., Nat'l Ass'n v. Hsin-Chi-Su*, 573 S.W.3d 845, 855 (Tex. App.—Houston [14th Dist.] 2018, no pet.). Courts also consider the following as evidence of alter ego status: payment of alleged corporate debt with personal

13

checks or other commingling of funds, representations that the individual will back the corporation financially, the diversion of corporate profits for personal use, and inadequate capitalization. *Id*. On appeal, we consider whether the record as a whole supports the trial court's implied finding that Booth Creek is Gillett's alter ego. *See Wormald*, 543 S.W.3d at 322.

In arguing that they proved Gillett is Booth Creek's alter ego, the Berry Parties point to the following facts as evidence of that relationship: (1) Gillett "runs all of his personal dealings through Booth Creek"; (2) Gillett commingles his personal funds with Booth Creek and has no separate bank account; (3) payments made in furtherance of the discounted letters of credit transaction were made by Booth Creek; (4) Gillett owns 100% of Booth Creek; (5) Gillett and Booth Creek share the same office; (6) Booth Creek does not follow corporate formalities, hold corporate meetings, or use separate letterhead; and (7) exercising jurisdiction over Booth Creek would not be burdensome because Booth Creek's only employees have already testified, Booth Creek and Gillett have the same lawyer, and Texas has a significant interest in adjudicating the dispute.

In response Booth Creek argues (1) Gillett and Booth Creek do not share the same address; (2) the commingling of funds is irrelevant to the jurisdictional analysis; and (3) despite Gillett's 100% ownership in Booth Creek he does not maintain "atypical control" over Booth Creek's businesses.

The evidence before the trial court is legally and factually sufficient to support the trial court's implied finding that Booth Creek and Gillett are alter egos under these exceptional circumstances, such that Gillett's Texas contacts should be imputed to Booth Creek. *See Wormald*, 543 S.W.3d at 321–22; *see also Lucas*, 696 S.W.2d at 374 (requiring "exceptional circumstances" to disregard the corporate form).

14

**A.    Commingling of funds and maintenance of observation of corporate formalities.**

Pope testified that he, in his capacity as an employee of Booth Creek, participated in the discounted letters of credit transaction. Gillett asked Pope to review the Acknowledgements and Pope acted as intermediary between Gillett and Berry regarding the "break-up fee" and other details contained in the Acknowledgements. Pope also consulted on the $100,000 "intake fees" for each letter of credit.

Throughout the transactions that form the basis of the underlying suit Gillett sent emails from his Booth Creek email address, made phone calls from his office at Booth Creek, and sent and received regular mail at the Booth Creek mailing address. Booth Creek paid "success fees" to Reckeweg in connection with the discounted letters of credit. Gillett's personal money is run through Booth Creek accounts because Gillett does not maintain a personal bank account. Gillett further testified that Booth Creek had no operating companies.

Booth Creek argues that it did not share the same address as Gillett, as Gillett had an office address distinct from his home address. Jurisdictional veil piercing does not require that the individual office out of his or her home, however. The record reflects that Gillett conducted all of his business, both the underlying transaction, which was personal to him, and Booth Creek business from the same address, which was the address listed for Gillett on the Acknowledgements.

Tew testified that, to her knowledge, Booth Creek did not conduct formal board or stakeholder meetings. It was within the trial court's discretion to weigh this conflicting evidence in denying the special appearance. *See Watamar Holding*, 583 S.W.3d at 325. We may not second guess the trial court's credibility determination. *Id.*

15

The record evidence demonstrates that Booth Creek did not observe corporate formalities, nor did Gillett and Booth Creek keep separate finances. Booth Creek paid Gillett's individual expenses by paying Reckeweg and Rogul for their contribution to the failed financial transaction. Booth Creek argues that Rogul "had nothing to do with the transaction involving the Discounting Agreements." That evidence is contradicted by Gillett's deposition testimony, and we may consider this admitted commingling of funds and disregard of corporate formalities as a factor in the jurisdictional alter ego analysis. *See Cappuccitti*, 222 S.W.3d at 482.

**B.      Stock ownership and degree of control**

It is undisputed that Gillett owns 100% of Booth Creek. The parties' dispute revolves around what degree of control Gillett exerts over Booth Creek. It is this plus factor of abnormal control that distinguishes, for jurisdictional purposes, an alter-ego relationship from the typical parent-subsidiary relationship—which involves common ownership, monitoring, reporting, and articulating of general policies. *TMX Fin. Holdings, Inc. v. Wellshire Fin. Servs., L.L.C.*, 515 S.W.3d 1, 9 (Tex. App.—Houston [1st Dist.] 2016, pet. dism'd). A review of the supreme court's seminal case in this area, *PHC-Minden*, 235 S.W.3d at 163, and a decision of our sister court in *Cappuccitti*, 222 S.W.3d at 468, is instructive in determining what level of control constitutes "atypical" control.

In *PHC-Minden*, the Supreme Court of Texas considered whether the Texas-related contacts of a parent company should be imputed to its non-resident subsidiary. *PHC–Minden*, 235 S.W.3d at 172. While a patient in a Louisiana hospital, a woman acquired toxic shock syndrome and died from the infection. *Id*. at 165. The woman's next friend and estate representative sued in Texas the tampon manufacturer, which in turn sued the hospital, alleging that the hospital's parent company, though based in Tennessee, had contacts with Texas that were imputable

16

to the hospital in Louisiana. *Id*. at 165–66.

The supreme court relied on the following facts to conclude that the Texas-related contacts of the Tennessee parent were not imputable to the Louisiana hospital:

> The two entities maintain separate headquarters, Minden [the subsidiary hospital] in Louisiana and Province [the parent company] in Tennessee. Minden's Board of Governors approves Minden's budget and oversees day-to-day operations, and Minden alone establishes its policies and procedures for providing health care to patients. Province is not involved in Minden's physician recruitment, and the two entities share no directors. While Minden's chief executive officer, chief nursing officer, and chief financial officer receive their paychecks from Province, their salaries are intercompany payables; that is, the monies come from Minden's revenues. Similarly, while Province provides Minden's general liability insurance and a group health insurance policy for its employees, the policies are funded from Minden's revenues. There is no indication that Minden and Province have disregarded corporate formalities. The court of appeals cited evidence that two Minden employees received Province stock options, but we have said that a parent company's offering a stock option plan to a subsidiary's employees is acceptable under IRS regulations and is not evidence of abnormal control over the subsidiary. Put simply, we find no evidence of control other than that consistent with Province's investor status.

*Id*. at 176 (citation omitted). *PHC–Minden* demonstrates that there is no bright-line rule for determining jurisdictional alter-ego status, and that it takes more than some evidence of a close business relationship to disregard formal corporate separateness.

The finding of no alter-ego status in *PHC–Minden* can be contrasted with the opposite result in *Cappuccitti*, 222 S.W.3d at 468. Cappuccitti, a chemical industry businessman, incorporated two Bahamian corporations on the same day. *Id*. at 474. He owned 100% of the parent company, which in turn owned 90% of the subsidiary. *Id*. The subsidiary entered into a business relationship with a Texas corporation that

manufactured chemicals used in mining. *Id*. at 474–75. When the subsidiary subsequently became insolvent and failed to pay external debts, the Texas-based manufacturer sued Cappuccitti's parent company and Cappuccitti in his individual capacity, in addition to the subsidiary with which it had a direct contractual relationship. *Id*. at 480. The subsidiary did not challenge personal jurisdiction, but Cappuccitti and his parent company appealed from the trial court's denial of their special appearances. *Id*.

Our sister court affirmed denial of the special appearances, finding that the plaintiff had presented sufficient proof to pierce the corporate veil for jurisdictional purposes. *Id*. at 484. Cappuccitti was the president of both corporations, the only employee of the parent corporation, and one of only two employees of the subsidiary. *Id*. at 474. Both companies operated out of Cappuccitti's home. *Id*. The subsidiary company directly paid Cappuccitti $10,000 per month as a "consultant," and Cappuccitti on at least one occasion covered the subsidiary's bills with a check drawn on his personal account. *Id*. at 475. As president of the subsidiary, Cappuccitti negotiated with the Texas-based manufacturer to grant valuable rights of first refusal to his wholly-owned parent company. *Id*. After the subsidiary company became insolvent, Cappuccitti acted as president of both companies to transfer all the assets from the subsidiary to the parent company for no value. *Id*. at 476. On these facts, the court concluded that the plaintiff had met its burden in proving that the individual Cappuccitti, the parent company, and the subsidiary were alter egos of one another and therefore Texas had personal jurisdiction over all of them. *Id*. at 484.

The jurisdiction-related facts in the present case more closely resemble those in *Cappuccitti* than in *PHC-Minden*. In addressing this factor the *Cappuccitti* court considered the "amount of financial interest, ownership, and control the individual maintains over the corporation." 222 S.W.3d at 483. In this case, Gillett and Booth

18

Creek operated out of the same physical address and Gillett used his Booth Creek email address and office to conduct the transactions that form the basis of this suit. Booth Creek paid non-employees "success fees" in connection with these transactions and other potential investments personal to Gillett. Booth Creek's CFO, one of three employees, was involved in negotiating the Acknowledgements used in the discounted letters of credit transactions.

As with direct piercing, reverse veil piercing applies only when necessary to prevent an injustice and in "exceptional circumstances." *See Wilson v. Davis*, 305 S.W.3d 57, 68 (Tex. App.–Houston [1st Dist.] 2009, no pet.). On this record, the totality of the circumstances shows that Gillett exercised atypical control over Booth Creek's business operations in a manner that is inconsistent with investor status. *Cf. Watamar*, 583 S.W.3d at 333–35 (examining jurisdictional alter-ego status based on a consideration of totality of the circumstances to conclude that atypical control was not established). We conclude that the evidence is legally and factually sufficient to support the trial court's implied finding that Booth Creek and Gillett are alter egos for jurisdictional purposes, such that Gillett's jurisdictional contacts should be imputed to Booth Creek. Therefore, under the exceptional circumstances of this case, the trial court did not err in finding that the presumption of corporate separateness had been overcome. Gillett did not challenge the trial court's personal jurisdiction over him, and after imputing Gillett's contacts to Booth Creek, the trial court did not err in impliedly determining Booth Creek had sufficient minimum contacts with Texas. We presume, without deciding, that even after finding that Booth Creek is the alter ego of Gillett, who waived any challenge to personal jurisdiction, the trial court still had to determine whether exercising jurisdiction over Booth Creek, as the alter ego of Gillett, offends traditional notions of fair play and substantial justice. *See Cappuccitti*, 222 S.W.3d at 480, 484, 486–87 (addressing whether exercise of

19

personal jurisdiction over two defendants would offend traditional notions of fair play and substantial justice, even after concluding that the trial court did not err in finding these defendants to be jurisdictional alter egos of a defendant who had waived any challenge to personal jurisdiction).

## III. Exercising jurisdiction over Booth Creek does not offend traditional notions of fair play and substantial justice.

In determining whether the exercise of personal jurisdiction over Booth Creek comports with traditional notions of fair play and substantial justice, we consider, when appropriate, (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiffs' interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental, substantive social policies. *Guardian Royal*, 815 S.W.2d at 231; *Amec Foster Wheeler plc v. Enter. Products Operating LLC*, No. 14-18-00133-CV, 2020 WL 897376, at *9 (Tex. App.—Houston [14th Dist.] Feb. 25, 2020, no pet. h.).

First, there is no undue burden on Booth Creek in defending this case in Texas. Gillett and Booth Creek are alter egos of each other and have hired the same attorney. Gillett is sole owner of Booth Creek, and Gillett did not contest the personal jurisdiction of the trial court. Booth Creek argues that it was not a party to the transaction and has no offices, employees or agents in Texas. This argument, however, ignores the nature of Gillett and Booth Creek's relationship. As demonstrated above, transactions involving Booth Creek and parties engaged in the Discounted Letters of Credit transaction will necessarily be at issue in the claims being tried in Texas and will not impose an additional burden at trial. We also note that the supreme court has held that distance alone cannot ordinarily defeat

20

jurisdiction. *See Moncrief Oil Intern. Inc. v. OAO Gazprom*, 414 S.W.3d 142, 155 (Tex. 2013).

Second, Texas has an interest in resolving this dispute because it involves the solicitation and conduct of business in Texas, including the execution of agreements performable in part in Texas under Texas law by Gillett in his personal capacity and as the alter ego of Booth Creek. Texas has a substantial interest in protecting its citizens both against harm from breach of contract and against harm from the torts alleged in this litigation. *See Silbaugh v. Ramirez*, 126 S.W.3d 88, 96 (Tex. App.— Houston [1st Dist.] 2002, no pet.) (finding that exercise of jurisdiction comported with fair play and substantial justice because Texas has an interest in ensuring that its citizens are protected from breach of contract and tortious acts committed by nonresidents conducting business in Texas). Third, the parties' contracts included a forum selection clause designating Harris County as the forum for any disputes regarding the contracts.

Accordingly, we hold that the trial court's exercise of jurisdiction over Booth Creek does not offend traditional notions of fair play and substantial justice. *See Cappuccitti*, 222 S.W.3d at 487. We overrule Booth Creek's sole issue.

## CONCLUSION

We affirm the trial court's denial of Booth Creek's special appearance.

/s/     Jerry Zimmerer
        Justice

Panel consists of Chief Justice Frost and Justices Zimmerer and Poissant.

21